**In re William C. WALLER, Jr. and Karen V. Waller, Debtors.**

**David W. WILDER, M.D., Plaintiff,**

v.

**William C. WALLER, Jr., Defendant.**

**Bankruptcy No. 96–16234 PAC.
Adversary No. 96–1522 RJB.**

United States Bankruptcy Court,
D. Colorado.

June 12, 1997.

Cecil E. Morris, Netzorg & McKeever, P.C., Denver, CO, for Plaintiff.

Joseph 0. Rosania, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

### *APPLICABLE LAW*

THIS MATTER came on for trial commencing April 21, 1997, on the Plaintiff's Amended Complaint brought under 11 U.S.C. § 523(a)(2)(A). That section provides as follows:

> (a) a discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . .

The Plaintiff must prove each element of his claim under § 523(a)(2)(A) by a preponderance of the evidence. *Grogan et al v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). And the Supreme Court has instructed that in construing the terms in

§ 523(a)(2)(A), reference must be made to the "...general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular state." *Field v. Mans,* —— U.S. ——, —— n. 9, 116 S.Ct. 437, 443 n. 9, 133 L.Ed.2d 351 (1995). The Supreme Court in that case declared the Restatement (Second) of Torts (1976) as the "... most widely accepted distillation of the common law of torts...." *Field v. Mans, supra,* —— U.S. ——, ——-——, 116 S.Ct. 437, 443–444, 133 L.Ed.2d 351.

In this case the Plaintiff alleges (1) that the Defendant made affirmative false statements, false representations and committed fraud; (2) that the Defendant concealed or failed to disclose material facts that he had a duty to disclose; and (3) that the Defendant committed "promissory fraud," i.e., that he made a promise to perform some future act or made a statement of intention to do some future act, when he had no intention of performing the promise or carrying out the stated intention.

The primary relevant sections of The Restatement (Second) of Torts (1976) (hereinafter referred to as the "Restatement") are as follows:

§ 525. Liability for Fraudulent Misrepresentation. One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

§ 526. Conditions Under Which Misrepresentation is Fraudulent (Scienter). A misrepresentation is fraudulent if the maker

(a) knows or believes that the matter is not as he represents it to be,

(b) does not have the confidence in the accuracy of his representation that he states or implies, or

(c) knows that he does not have the basis for his representation that he states or implies.

§ 530. Misrepresentation of Intention.

(1) A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.

(2) A representation of the intention of a third person is fraudulent under the conditions stated in § 526.

§ 531. General Rule. One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

§ 537. General Rule. The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if,

(a) he relies on the misrepresentation in acting or refraining from action, and,

(b) his reliance is justifiable.

§ 538. Materiality of Misrepresentation.

(1) Reliance upon a fraudulent misrepresentation is not justifiable unless the matter misrepresented is material.

(2) The matter is material if

(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

§ 544. Statement of Intention. The recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out.

§ 550. Liability for Fraudulent Concealment. One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though

he had stated the nonexistence of the matter that the other was thus prevented from discovering.

§ 551. Liability for Nondisclosure.

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

## FACTS

This case arose out of transactions concerning a failed business called The Lawyer's Edge ("TLE"). The Defendant ("Waller") is an attorney licensed to practice in Colorado who specializes in commercial law litigation. The Plaintiff ("Wilder") is an M.D. who, at the beginning of the transactions involved here, was the head of the Radiology Department at Rose Hospital in Denver, Colorado. The parties put forth the following uncontroverted facts in their Joint Pre–Trial Order filed April 7, 1997:

1. Waller represented Wilder as Wilder's attorney on a number of matters from November 1993 until August 1995.

2. In November 1994, Wilder agreed to lend money to TLE on certain conditions. TLE executed and delivered to Wilder a Line of Credit Promissory Note dated November 1, 1994, in the original principal amount of $150,000 (referred to, together with any amendments thereto, as the "LOC Note"), bearing interest at 15% per annum, maturing on November 1, 1995. The LOC Note was signed by Waller on behalf of TLE.

3. In further consideration of Wilder's loans to TLE, the Wallers [1] guaranteed payment of the LOC Note pursuant to a written Guaranty dated November 1, 1994 ("the Guaranty"). The Wallers executed and delivered the Guaranty to Wilder at the same time as the LOC Note.

4. On November 15, 1994, before Wilder signed the Memorandum of Understanding and made the first cash advance to TLE, Wilder retained separate counsel Barbara J. Wells, Esq., and [sic] Minor & Brown to advise him in connection with the MOU, and they continued to represent him in connection with his business dealings with TLE.

5. The LOC Note and the Guaranty were subsequently amended by (I) the Request for Advance on Line of Credit and Amendment to Line of Credit Promissory Note and Amendment to Guaranty dated January 7, 1995 (the "First Amendment"), (ii) the Second Amendment to Line of Credit Promissory Note and Second Amendment to Guaranty (the "Second Amendment"), dated February 1995, and (iii) the third Amendment to Line of Credit Promissory Note and Third Amendment to Guaranty and Amendment to

---

1. Although both Mr. & Mrs. Waller are debtors in the main bankruptcy case, only Mr. Waller is a defendant in this adversary proceeding.

Security Agreement and Amendment to Stock Pledge Agreement (the "Third Amendment"), which is undated but relates to amounts advanced after May 23, 1995.

6. Wilder loaned TLE a total of $337,000 pursuant to LOC Note, as amended by the First Amendment, Second Amendment, and Third Amendment, on the following dates and in the following amounts:

| | |
|---|---|
| 11/15/94 | $15,000 |
| 11/30/94 | 15,000 |
| 12/14/94 | 15,000 |
| 12/28/94 | 15,000 |
| 1/11/95 | 15,000 |
| 1/18/95 | 15,000 |
| 2/2/95 | 15,000 |
| 2/15/95 | 20,000 |
| 3/15/95 | 20,000 |
| 3/25/95 | 12,000 |
| 4/14/95 | 10,000 |
| 4/28/95 | 20,000 |
| 5/5/95 | 25,000 |
| 5/31/95 | 35,000 |
| 7/7/95 | 5,000 |
| 7/13/95 | 35,000 |
| 7/20/95 | 18,000 |
| 8/7/95 | 32,000 |

7. In addition, in response to TLE's request dated January 7, 1995, Wilder agreed to and did execute an irrevocable guaranty of TLE's office space lease in the amount of $45,000, in favor of Guaranty Bank. TLE requested, and Wilder agreed, that any amounts paid by Wilder pursuant to that guaranty would also be subject to the terms of the LOC Note and the Wallers' Guaranty. On October 12, 1995, Wilder was required to pay $45,000 to Guaranty Bank on the guaranty of TLE's office space lease. As a result, the total principal amount advanced or paid by Wilder under the LOC Note, its amendments, and the Guaranty, is $382,000.

8. On May 15, 1995, Wilder agreed to loan the Wallers $7,500.00 pursuant to a promissory note. The note was payable in a lump sum payment, with accrued interest, on May 15, 1997.

9. On June 7, 1995, Wilder agreed to loan the Wallers $5,750.00 pursuant to a promissory note. The note was payable in a lump sum payment, with accrued interest, on June 7, 1997.

10. On June 30, 1995, Wilder agreed to loan the Wallers $6,528.00 pursuant to a promissory note. The note was payable in a lump sum payment, with accrued interest, on June 30, 1997.

11. On August 3, 1995, Wilder agreed to loan the Wallers $2,000.00 pursuant to a promissory note. The note was payable in a lump sum payment, with accrued interest, on August 3, 1997.

12. Pursuant to the terms of the foregoing four notes (collectively, the "Four Promissory Notes"), Wilder loaned the Wallers a total of $21,778.00. These funds were used to pay the Wallers' personal expenses in order to allow Waller to focus on TLE's business.

13. No payments were made on the Four Promissory Notes.

14. The full principal amount of $21,778.00, plus interest, is now due and owing on the Four Promissory Notes.

15. On August 23, 1995, Wilder provided Waller, as President of TLE, with written notice that TLE was insolvent and therefore in default under the LOC Note (the "Notice of Default"). In the Notice of Default, Wilder declared all amounts due under the LOC Note immediately due and payable. The Notice of Default was delivered to Waller at home at approximately 10:15 p.m.

16. By failing to pay the amounts due within five business days of the Notice of Default, TLE was in default under the LOC Note as of August 30, 1995.

17. The full amount of principal in the sum of $382,000, together with interest, is now due and owing on the LOC Note.

18. TLE owes Wilder the unpaid principal and interest due on the LOC Note as well as Wilder's attorney fees, expenses and costs, by virtue of TLE's default under the LOC Note.

19. Waller made no payments to Wilder on the Guaranty of the LOC Note.

The evidence at trial showed the following. Defendant was admitted to practice law in 1976 and had a successful law practice. Plaintiff moved to Denver in February 1990 and became the Chairman of the Radiology Department at Rose Hospital under a con-

tract that provided him with $800,000 per year. In addition, he had a Professional Corporation. The parties met at a golf tournament in Snowmass, Colorado, in the Spring of 1990. Thereafter, they became close friends and belonged to the same country club. They, and their spouses, traveled together to out of town golf tournaments and socialized together. In fact, Plaintiff stated that Defendant was almost like a brother.

In late 1993 Defendant commenced legal representation on behalf of Plaintiff. Some of the matters were obviously minor, e.g., a dispute with Plaintiff's homeowner's association over a "Beware of Dog" sign on Plaintiff's fence, and a letter Defendant wrote for Plaintiff about a satellite dish. Some of the matters were of more import, e.g., Defendant reviewed and advised Plaintiff on his contract with Rose Hospital, and he did work for Plaintiff's P.C. about billing methods with Medicare. Thus, there was an attorney/client relationship. However, overshadowing that relationship was a very close personal relationship. In fact, the Court is left with the impression that any "legal" work done by Defendant for the Plaintiff was done more out the friendship than out of the attorney/client relationship. There was no evidence that Defendant ever charged Plaintiff for these legal services or that Defendant ever paid for such services. But, nevertheless, there was an attorney/client relationship,

Sometime prior to 1993 Defendant became a shareholder in TLE. The company had been in existence for some time, but Defendant and his other two shareholders were planning to take it in a new direction, i.e., they were going to meld the practice of law with modern technology and give national seminars and provide expert consulting services in connection therewith. They were keeping the name because there was national name recognition, but the company, because of its change in focus, was in reality a "start-up" company.

In late 1993 Defendant began discussing TLE on a casual basis with Plaintiff. Defendant was going to leave the practice of law to devote full time to TLE. In about April 1994 the discussions became more serious. And in the fall of that year, because Defendant knew Plaintiff might be interested, he approached Plaintiff about coming into the organization. In August 1994 Plaintiff made some detailed notes in his diary (Def.Ex.4) outlining specific items to be included in a Letter of Agreement. In October 1994 TLE put on a "major" seminar that Plaintiff attended, where he received materials about TLE. At Plaintiff's request, Plaintiff and Defendant met with Plaintiff's banker, David Boyles, at Guaranty Bank. Plaintiff knew it was a "new business" even though the company had been doing business for about ten years. They discussed TLE's business concept, plans, and desires. They also discussed getting an operating loan or line of credit. They were told that since the company was basically a "start up" company and had no track record, the bank would not be interested in a loan at that time.

In October 1994 Plaintiff met with Greg Truitt, a CPA. Truitt was the CPA for Plaintiff and Plaintiff's P.C. since the summer of 1993 and still is Plaintiff's CPA. He had been recommended to Plaintiff by Defendant. Truitt was also the CPA for TLE from late 1994 to the summer of 1995. Plaintiff inquired of Truitt about TLE. Truitt told him that TLE was like other start up companies and that what TLE was attempting to do was a credible idea.

Plaintiff also talked to Bonnie O'Donnell about the company prior to any investments in TLE. O'Donnell began working for TLE in August 1994 and at first she set up the training seminars for the company. In October 1994 she became President and was in charge of the daily operations. Plaintiff had met O'Donnell at the country club and Plaintiff was a client of her husband who was a stock broker.

The evidence also showed that Defendant had told Plaintiff "I'm a lawyer, not a doctor. Doctors make more money. I'm making a substantial commitment to the company and it has taken substantially all my cash." Plaintiff had been in Defendant's home, which was admittedly a nice home in a very nice part of town. However, Defendant had only "average" furniture and there were no coverings on the windows. Defendant had

one nice car, but his second car was a 1986 Volvo with over 100,000 miles on it. He also told Plaintiff four or five times they had to separate their friendship from their business relationship, that Defendant could not be Plaintiff's lawyer on the matter because there was a conflict, and that Plaintiff must rely on separate legal advice. Plaintiff agreed and said he would see Barbara Wells who had been doing other legal work for Plaintiff

Then in November 1994 Plaintiff was given the Business Plan for TLE (Def.Ex.4). This Plan contained very optimistic pro-forma cash flow projections, but that's just what they were—projections. Around the middle of November 1994 Plaintiff had agreed to become involved, and Defendant sent him a Memorandum of Understanding ("MOU") dated November 13, 1994. (Def. Ex. 6 & Plaintiff Ex. A). Defendant didn't send the MOU to Wells because Plaintiff told him to send it directly to him. Plaintiff said that every time you send a copy to an attorney, the attorney generates a bill. Plaintiff nevertheless sent the MOU to Wells (as is shown by the FAX transmittal information on the top of the Exhibit), and she gave suggestions for amendments thereto. The parties discussed some changes, and a revised MOU was sent by Defendant to Plaintiff on November 14, 1994. (Def.Ex. 7 & Plaintiff Ex. B). Again revisions were discussed (See Plaintiff Ex. C). The final version was agreed to and signed by the parties on November 15, 1994. (Def. Ex. 7 & Plaintiff Ex. D). The agreement provided that Plaintiff would loan $150,000 to TLE evidenced by a promissory note from TLE with interest at 15% per annum payable 12 months after the first advance. The loan would be secured by all the assets of the company and by a second promissory note from the Wallers. The Waller note would provide for a 10–year payback commencing one year after the company defaulted on its note. Defendant and Plaintiff had discussed this 11–year time span several times. Defendant told Plaintiff that if the Wallers had to make good on the loan it would take some time for Defendant to get back into the practice of law and generate the funds to make the payback. The MOU also gave Plaintiff the option of making a

$150,000 equity investment for 20% of the company. Plaintiff was given the right to participate in the management of the company as a member of the Board of Directors and the right to have full access at any time to all the business records of the company. And the MOU stated that TLE was anticipating leasing new quarters and that a letter of credit provided by Plaintiff in the amount of $47,500 would be needed to guarantee TLE's performance under the new lease. Plaintiff did subsequently obtain that letter of credit, which was called after the company failed. And Plaintiff had to make good on that letter for $45,000. However, he was also furnished a copy of the lease prior to obligating himself on the letter of credit, contrary to his assertions that he was misled as to the amount of the monthly rent due under the lease.

Then, on November 15, 1994, Plaintiff made his first advance on the loan for $15,000 (Def.Ex.9). This first advance was needed right away to enable TLE to make payroll, and Plaintiff knew that. Subsequently, the LOC and Guaranty and security documents (Pl.Ex. F, G, H, & I) were executed and delivered to Plaintiff. Even though these documents are dated November 1, 1994, the parties agree that they were prepared, executed and delivered after November 15, 1994. And, as set forth in the parties' Joint Pre–Trial Order, *supra*, Plaintiff continued to make further advances, and the LOC note and Guaranty were amended on three separate occasions. For whatever reason, the LOC and Guaranty documents (and the subsequent amendments thereto) did not spell out the 11–year payback period for the Wallers that had been agreed to in the MOU.

Although Plaintiff denies that he had any role in the management of TLE, the evidence belies that assertion. Plaintiff attended weekly staff meetings and Board of Director Meetings. He was instrumental in the hiring and firing of employees. For example, in June 1995 he got Carol Getty hired as Office Manager. Getty was Plaintiff's secretary at Rose from late 1990 to June 1995. Plaintiff got a man by the name of Jack Rhue hired by TLE. Plaintiff had taken a computer course from Rhue. He was in on the inter-

view of Laurie Phillips Oakes when she was hired. He was instrumental in having Gary Peterson cut as an employee and put on as a consultant; in eliminating the position of Martha Leahy; in having the hours cut back for an employee by the name Vanderhyden; and in the firing of O'Donnell. He was on a compensation committee. He received revised pro-formas and business plans, and at one point even suggested that they use actual financial data on these documents in lieu of projections. In fact, Plaintiff's management style was described as rule by intimidation in an unsupportive and negative fashion. When he gave "directives" everyone did as they were told because Plaintiff "wrote the checks." Plaintiff was also described by various witnesses as "bright, precise, definitive, hard on people working for him, demanded excellence, intelligent, very careful, and a deliberate decision maker." Witnesses, who were all former employees of the company, also testified that they never knew of any false information that was given to Plaintiff and that Plaintiff was given any information he asked for.

However, the Plaintiff had a very selective memory about which documents he had received concerning the operations of the company. He had a lot of "I don't remember seeing this document" type answers when it was later shown that the documents in question came from his own files. Thus, when the Plaintiff testified that Defendant never told him certain things, the Court also questions these statements. The Court finds that for the most part the Plaintiff's testimony lacked credibility.

In January 1995 Plaintiff exercised his right to purchase equity in the company and bought 1014 shares for $33.74/share. In connection therewith, on January 31, 1995, he signed a stock subscription agreement wherein he asserted that he was an "accredited investor" within the meaning of Rule 501(a)(5) and/or 6 promulgated by the SEC and that he had made an investigation of the company and its business and had available to him all information he needed to make an informed decision to acquire the stock. (Def.Ex.15). On May 23, 1995, Plaintiff made another purchase of 7455 shares of stock in the company at $1.00/share and signed another similar stock subscription agreement making the same assertions. This second purchase was made after discussing with Truitt, the CPA, the fact that the company was actually insolvent, and it was agreed that only a "nominal" amount should be paid for the stock.

Plaintiff also knew that Defendant was supposed to be paid $10,000/month by the company but that the Defendant had never taken any salary except for two separate checks for $4,000 in 1994. So, as set forth in the parties' Joint Pre–Trial Order, Plaintiff made four separate loans to Defendant and his wife for personal living expenses beginning on May 15, 1995, for a total of $21,778.00. At the time of the first loan, Plaintiff requested and received from the Defendant a Stock Pledge Agreement (Def. Ex. 37 & Plaintiff Ex. Q) dated May 23, 1995, wherein Defendant pledged all of his stock in TLE (8,528 shares) to Plaintiff as security not only for the personal loans to Defendant but also as security for the loans to TLE. This stock pledge agreement also contained a power of attorney and proxy authorization. There was no doubt that after this agreement, Plaintiff was in absolute control of TLE. And all this was done after Plaintiff's attorney had written a letter on April 28, 1995, to TLE declaring a default under the LOC note and threatening to accelerate and foreclose unless Plaintiff got more stock. (Def.Ex. 32).

Then in July 1995 Plaintiff was notified by the hospital that his $800,000/year contract was not going to be renewed. This was the real precipitating event (and the fact the Plaintiff's wife didn't want him to invest any more money in the venture) that caused the collapse of the relationship, notwithstanding Plaintiff's assertions that he just all of a sudden found out in July and August 1995 that the company was not performing according to the pro-formas. In fact, on August 23, 1995, his own attorney, Barbara Wells, sent a letter to Defendant (which was hand delivered to Defendant at his home after 10:00 p.m.) wherein it is stated "Over the past several months our client [Plaintiff] has observed the financial condition of the company with great concern. The continuing losses

and inability of the company to pay its obligations have led our client to conclude that the company is insolvent and that his collateral is insufficient given the amount that has been loaned."

So there were some meetings and a lot of correspondence between the parties and Wells. In September 1995 Defendant wrote to Wells saying "There has never been an expectation by David [Plaintiff], me or anyone else that the company would be postured in any different position than it is now. There was also always the expectancy on both his part and the company that a new note would be executed in November. The company never planned to have the cash available to pay the note on November 1st, and David specifically told me in May that he did not want to explore any alternative financing arrangements before then."

In any event, after a meeting in mid-September 1995, the office was closed. The Defendant borrowed money from his law partner and paid all the employees and got releases from them for the benefit of both himself and TLE; he recommended that TLE use the cash it had to pay the IRS; he went to the copy machine company and assumed the lease for the copier; he went to the furniture leasing company and liquidated and paid the lease over time (he got a 40% reduction on the balance); he took the telephone system and assumed the lease; and he tried to work a sub-lease for TLE's lease, but Wells said just give up the space and let the $45,000 letter of credit go.

In the meantime, Getty, the very loyal former secretary of Plaintiff and the Office Manager for TLE, took her marching orders from Plaintiff and Wells. Between September 14, 1995, and February 1, 1996, she worked full time for three months and then part time. She was paid by taking $2,500 from the TLE accounts with Plaintiff's and Wells' permission. She also wrote herself two more checks for a total of about $4,000. She wrote the "liquidation plan" for the company, which Wells approved. In fact, she had possession of the company records at her residence after September 1995 and complained that she was never fully compensated because she had truck rental expenses, etc.

At one point around the end of July 1995, a former TLE employee was observed by a present employee apparently using proprietary information belonging to TLE, and this information was given to Plaintiff. Plaintiff apparently contacted Defendant and chewed him out, and it was the first that Defendant had heard of the matter. That is when Defendant told the employees at TLE that they could give Plaintiff any information they wanted, but that they should tell Defendant first so that he would know what was coming when Plaintiff called him. Defendant apparently also stated something to the effect that because of his position he should be the one to give information to Plaintiff and not everyone else. Even Ms. Getty agreed that this was correct procedure.

## CONCLUSIONS

■ This Court has been unable to find one instance where the Defendant made any affirmative misrepresentations to Plaintiff, either fraudulently or negligently. In fact, all the evidence shows that Defendant was forthright and honest in his dealings with Plaintiff. Plaintiff knew from the beginning that this was a risky start up business and that it was in serious need of financial support, and there is simply no evidence to show that he was misled on that point in any way. In fact, in a memo to Defendant on March 24, 1995, the Plaintiff stated "During our initial discussions I knew perfectly well that finances were a problem for TLE ..." (Def.Ex.23). The business plans were all optimistic projections, and Plaintiff knew they were projections, not statements of actual performance or guarantees of future success. After all, the Plaintiff was not an unsophisticated investor or individual, and he talked to several people besides the Defendant before he made his first loan, e.g., Truitt and Boyles.

■ Did the Defendant fraudulently conceal information from the Plaintiff? Defendant would be liable under this theory only if there was a duty on him to disclose. Plaintiff argues that such a duty arose because of the attorney/client relationship between the parties. In the case of *Fowler Bros. v.*

*Young,* 91 F.3d 1367 (10th Cir.1996), the Court held that under the New Mexico Rules of Professional Conduct, Rule 16–108A, an attorney is under a duty to disclose whenever he enters into a business transaction with a client and that failure to comply with that Rule was a "false representation" under 11 U.S.C. § 523(a)(2)(A). Colorado has a similar, though not identical rule, Rule 1.8, Colorado Rules of Professional Conduct. However, the Tenth Circuit did not address language in the Scope section of the New Mexico Rules (which is identical to that contained in the Colorado Rules) which provides as follows:

> Violation of a rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist is a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

This Court suspects that this language in the Rules was not brought to the attention of the Tenth Circuit when it ruled that a violation of the New Mexico Rule was, in effect, *per se,* a false representation under § 523. As stated, this Court *suspects* that to be the case, but it cannot assume that to be true. This Court must assume that the Tenth Circuit Court of Appeals was fully aware of the quoted language when it ruled. Therefore, this Court too must hold that a violation of Rule 1.8 of the Colorado Rules of Professional Conduct is, *per se,* a false representation under 11 U.S.C. § 523(a)(2)(A) even in the face of the specific language quoted, *supra,* prefacing those Rules.

■ There was expert testimony from both sides as to whether Defendant did, or did not, violate Rule 1.8. In all the cases relied upon by the expert witnesses, and in the research done by this Court, no case had been found where a rule such as Rule 1.8 was determined to have been violated when the non-attorney had separate counsel, as is the situation here. But this Court does not have to decide whether or not the Defendant violated Rule 1.8, because it finds that even if the Defendant breached a duty to disclose, there was no intent to deceive the Plaintiff. Although Plaintiff points to the evidence that Defendant told the employees not to tell Plaintiff anything until they had first told him as evidence of intent to conceal and deceive, that statement was not made until July 1995, well after Plaintiff had invested and made the loans to TLE and the Defendant. In addition, the Court finds that such statement was made not to prevent Plaintiff from learning the true facts, but simply to give Defendant a little advance warning before Plaintiff called him on the carpet. That is the only evidence that even comes close to showing an intent to conceal or deceive.

■ Finally, the Plaintiff asserts that Defendant is guilty of misrepresentation of intent, or as stated in the pleadings and briefs, promissory fraud. What does Plaintiff point to as a promise made by Defendant that Defendant had no intent to fulfill? First, he points to the LOC and Guaranty, and the amendments thereto. As stated, *supra,* there is no mention in those documents of the agreement between the parties (contained in the MOU) that Defendant would have 11 years to honor his guaranty, and yet in the final days of operation of the company Defendant again asserts this condition. If one ignores the language in the MOU and just uses the LOC and Guaranty as the starting point it would be possible to claim promissory fraud. But there was absolutely no evidence that the 11 year payout was ever negotiated out of the deal. Again, the Court, based on this state of facts cannot find that Defendant has shown any intent to deceive the Plaintiff in connection with the 11–year payout.

Next Plaintiff asserts that Defendant fraudulently promised that the loans to TLE would be paid back in November 1995 when he had no intention of doing so. Again, the LOC and Guaranty documents standing alone would seem to indicate such promissory fraud. However, Defendant stated in his letter of September 1, 1995 (Pl.Ex.LLL) that "There has never been an expectation by David, or me or anyone else that the company would be postured in any different position than it is now. There was also always the expectancy on both his part and the company that a new note would be executed in November. The company never planned to have the cash available to pay the note on November 1st, and David specifically told me in May that he did not want to explore any alternative financing arrangements before then." This statement was never contradicted by the Plaintiff. Again, the Court finds no intent to deceive on the part of the Defendant. Nor does the Court find other possible promises made by the Defendant to Plaintiff that he did not intend to keep at the time he made them. It is, therefore,

ORDERED that judgment of dismissal enter in favor of the Defendant and against the Plaintiff, each party to bear their own costs.