# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-3819

_____

| | | |
|---|---|---|
| In re: Eliot M. Alport, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Eliot M. Alport, | * | |
| | * | Appeal from the United States |
| Appellant, | * | District Court for the |
| | * | Eastern District of Missouri |
| v. | * | |
| | * | |
| Jerry E. Ritter; | * | |
| Margaret A. Ritter, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted:   April 13, 1998

Filed:   May 29, 1998

_____

Before BOWMAN,[1] Chief Judge, and McMILLIAN and MURPHY, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

_____

[1]The Honorable Pasco M. Bowman succeeded the Honorable Richard S. Arnold as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 17, 1998.

Eliot M. Alport (debtor) filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court[2] for the Eastern District of Missouri on September 16, 1992. Jerry E. Ritter and Margaret A. Ritter (the Ritters) timely brought an adversary proceeding asserting the nondischargeability of their claim against debtor under 11 U.S.C. § 523(a)(2)(A), (a)(4), (a)(6). Following a three-day hearing, the bankruptcy court entered judgment for the Ritters in the amount of $184,362.00, upon a determination of nondischargeability under § 523(a)(2)(A). In re Alport, No. 92-46298-293 (Bankr. E.D. Mo. June 14, 1996) (order); id. (June 19, 1996) (memorandum opinion). In a separate order, the bankruptcy court awarded the Ritters their pre-petition and post-petition attorney's fees, totaling $93,166.90, as part of the nondischargeable debt. Id. (Aug. 30, 1996). Debtor appealed both orders of the bankruptcy court to the district court[3] pursuant to 28 U.S.C. § 158(a). Upon review, the district court affirmed the orders of the bankruptcy court. Id., No. 4:96CV2001 (E.D. Mo. Sept. 18, 1997). Debtor appealed the district court order to this court pursuant to 28 U.S.C. § 158(d). For reversal, debtor argues that the bankruptcy court erred in: (1) piercing the corporate veil to hold him personally liable for the Ritters' claim; (2) interpreting and applying § 523(a)(2)(A); (3) applying the "collateral source rule"; and (4) including attorney's fees in the nondischargeable debt. For the reasons stated below, we affirm.

## Background

The following is a summary of the underlying facts as found by the bankruptcy court. Debtor has been in the home-building business since the late 1960s. In 1969, he acquired ownership of Thunderbird Construction Company (Thunderbird

---

[2]The Honorable David P. McDonald, United States Bankruptcy Judge for the Eastern District of Missouri.

[3]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

Construction), which specializes in custom home building. Over the years, debtor has established or acquired other companies as well. He used Thunderbird Construction as the construction contractor for developments built by his real estate companies including The Alport Group (TAG). In 1980, debtor moved from St. Louis to Vail, Colorado. He set up an irrevocable living trust called the "Silverstein trust" and transferred much of Thunderbird Construction's assets and other investments and holdings to the Silverstein trust. TAG was started in 1986 by debtor, Bruce Goldford, and Ernie Niswonger. Goldford is debtor's nephew, and Niswonger was Goldford's business associate. After TAG was established, debtor commuted between Vail and St. Louis. On September 1, 1988, TAG and Thunderbird Construction entered into an agreement whereby Thunderbird Construction was to serve as the construction contractor for TAG's first and only real estate development, a subdivision called "Sheffield Estates" in St. Louis County, Missouri.[4]

The Ritters became interested in building a custom home in Sheffield Estates in June of 1987. In August 1987, the Ritters signed a sales contract to purchase two lots for $470,000. Debtor signed the sales contract as president of TAG. The contract specified that TAG reserved the exclusive right to build a residence on the property. Thereafter, Goldford signed most of the documents for TAG in dealing with the Ritters but, according to the bankruptcy court, debtor "demonstrated that he was in charge of the project." In re Alport, slip op. at 8 (Bankr. E.D. Mo. June 19, 1996). On July 12, 1988, the Ritters and TAG entered into a "base contract" for the construction of the residence for $882,000. The base contract provided, among other things, that TAG "shall not permit any mechanic's or materialmen's liens to be filed against the [Ritters' house]" and that, if attorney's fees and costs are incurred to enforce the contract or

---

[4]TAG, Thunderbird Construction, and three other business entities owned and operated by debtor were housed in the same office. The costs and services of personnel, rent, and other overhead expenses were not segregated or apportioned among the several entities sharing the office.

recover damages for a breach of the contract, the non-prevailing party must pay the prevailing party's reasonable costs and attorney's fees. See id. at 9. The Ritters, TAG, and Lawyers Title Company (LTC) entered into an escrow agreement, whereby LTC was to serve as the disbursing agent of payments made under the base contract. The bankruptcy court found that the parties agreed that TAG would pay subcontractors and materialmen for work performed on the Ritters' house and then would submit lien releases signed by the subcontractors and materialmen to LTC to obtain reimbursements from the Ritters' escrow account. Id.[5] After construction on the house began, the Ritters decided to make some changes to the original specifications. Debtor suggested, and the Ritters agreed, that they would bypass LTC with respect to the "change orders" and instead the Ritters would pay TAG directly for any additional work.

Debtor deposited funds received from the Ritters and from LTC into Thunderbird Construction's bank account. He drew money from that account not only to make partial payments to the subcontractors and materialmen, but also to pay his own "salary," to make deposits into the Silverstein trust, and to pay for personal expenses unrelated to the Ritters' house. The bankruptcy court found that, between February 1988 and June 1989, debtor diverged to his own benefit $568,385 from the Thunderbird Construction account; by contrast, debtor was able to demonstrate that the Thunderbird Construction account was repaid only $169,139 by the Silverstein trust and $35,000 by debtor. Id. at 12. In the spring of 1989, Thunderbird Construction owed $367,556 to the subcontractors and materialmen for work on the Ritters' house. Meanwhile, debtor continued to submit documentation to LTC to receive payments from the escrow account.

_____

[5]The evidence showed that LTC agreed to this relatively unusual arrangement whereby the money would be channeled through TAG, rather than paid directly from LTC to the subcontractors and materialmen, because LTC was trying to secure debtor's business.

In June 1989, while debtor was away, Goldford took steps to exclude debtor from TAG's business operations. Goldford changed the locks on the doors to the office which housed TAG and debtor's other companies. He told the Ritters that many of the subcontractors and materialmen were still owed hundreds of thousands of dollars even though the Ritters had fully paid for the work done on the house. Goldford told the Ritters that debtor had improperly diverted funds paid by the Ritters to debtor's own use. The Ritters thereafter paid the subcontractors and materialmen directly for the remaining unfinished work on the house, at an added cost to the Ritters of $260,689.

Needless to say, debtor and Goldford had a "complete falling out." Id. at 15. Goldford wound up the business of TAG. Debtor moved to California. Neither debtor nor Goldford paid any of the outstanding debts owed to the subcontractors and materialmen for work done on the Ritters' house. Id. Numerous mechanic's liens were filed against the house, and a lawsuit was brought to perfect those liens. The Ritters hired an attorney who settled the liens. Pursuant to an indemnity agreement contained in the escrow agreement, LTC partially reimbursed the Ritters for the settlement of the mechanic's liens. Id. at 15-16.

**Discussion**

*Standard of review*

We apply the same standards of review to the bankruptcy court's orders as the district court. Findings of fact are reviewed for clear error and conclusions of law are reviewed de novo. Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir. 1987).

*Piercing the corporate veil*

Debtor first argues that the bankruptcy court erred in piercing the corporate veil of TAG to hold him personally liable for its debts. Debtor points out that he had only

a one-third ownership interest in TAG.  He also argues that he had far less control over TAG than Goldford.  Debtor argues that Goldford's actions, not his, caused the Ritters' losses because Goldford had unilaterally decided to tell the Ritters that the funds did not exist to pay the subcontractors and materialmen.  Debtor also contends that, contrary to the bankruptcy court's findings, the Ritters still owed TAG over $300,000, and therefore, in the end, cash flow would not have been a problem. The bankruptcy court pierced the corporate veils of TAG and Thunderbird Construction on the basis of the non-party testimony of Goldford and others whom the bankruptcy court found to be credible.   Upon review of the well-supported findings made by the bankruptcy court, we agree with the district court that the record as a whole amply supports the bankruptcy court's decision to disregard the corporate forms of TAG and Thunderbird Construction in holding debtor personally liable for the Ritters' losses.

*11 U.S.C. § 523(a)(2)(A)*

Debtor next challenges the legal and factual bases for the bankruptcy court's grant of relief under § 523(a)(2)(A), which excludes from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A). Debtor maintains that the Ritters failed to prove by the requisite preponderance of the evidence certain elements of fraud or false representation.  See, e.g., In re Ophaug, 827 F.2d 340, 342 n.2 (8th Cir. 1987) (setting forth elements of fraudulent misrepresentation).   Debtor suggests that the Ritters established, at best, a breach of contract.  He argues that the escrow arrangement did not require TAG to pay the subcontractors and materialmen first;  rather, he contends, TAG agreed to obtain the funds from LTC and then pay the subcontractors and materialmen.  He also maintains that, to the extent the escrow arrangement caused the Ritters' losses, Goldford was responsible because he signed the vouchers and endorsed the Ritters' escrow payments. To the extent the change orders caused the Ritters' losses, debtor claims, the person

responsible was the Thunderbird Construction employee who prepared the invoices for the change orders.

The bankruptcy court found that debtor represented to the Ritters that he would pay the materialmen and subcontractors before seeking payment from the LTC escrow account or from the Ritters under the change orders, but instead debtor consistently failed to pay the materialmen and subcontractors first. Moreover, the bankruptcy court concluded that debtor had presented LTC with false documentation implying that he had made such prior payments. Jerry Ritter testified at the bankruptcy hearing about the escrow arrangement as it was explained to him by debtor; that testimony directly supports the bankruptcy court's findings. Moreover, it was reasonable for the bankruptcy court to infer from the evidence that debtor knew his representations were false, that he acted with the intent to defraud the Ritters, that the Ritters relied on his representations about timely payment of the subcontractors and materialmen, and that the Ritters' reliance was justified in light of debtor's apparent expertise in residential construction and financing. Finally, proximate cause was sufficiently established because, absent debtor's misrepresentations, the Ritters would not have put funds into the LTC escrow account or paid TAG directly for work under the change orders.

*Collateral source rule*

As stated above, LTC partially reimbursed the Ritters for the amount they paid to settle the mechanic's liens. The bankruptcy court held that, under the "collateral source rule," as set forth in Overton v. United States, 619 F.2d 1299, 1306 (8th Cir. 1980), the payment from LTC to the Ritters should not be a basis for reducing the amount of the nondischargeable debt. On appeal, debtor argues that the bankruptcy court erred in applying the collateral source rule to exclude consideration of LTC's reimbursement to the Ritters because, under the indemnity agreement contained in the escrow agreement, LTC had the right to sue the contractor (i.e., Thunderbird Construction) as the subrogee of the Ritters' rights. Debtor also argues that the

collateral source rule was erroneously applied in the present case because the Ritters' claim is based upon a contract rather than tort claim, the collateral source (i.e., LTC) is not wholly independent from the alleged wrongdoer (i.e., debtor), and the parties have not expressly contracted for such a "double recovery." See id. at 1306-07.

Upon careful review, we hold that the bankruptcy court's application of the collateral source rule is not inconsistent with Overton. We read the language in Overton, stating that either the collateral source must be independent from the alleged wrongdoer or the parties must have contracted for double recovery, id. at 1307, in the context of that case. In Overton, the collateral source and the alleged wrongdoer were one and the same. In the present case, by contrast, LTC and debtor are not the same entity and, moreover, debtor never contributed anything toward LTC's indemnity payment. Moreover, LTC's right of subrogation does not bar the Ritters' right of recovery in the present case. See, e.g., Mason-Rust v. Laborers' Int'l Union, 435 F.2d 939, 945 (8th Cir. 1970) (indicating that collateral source rule may apply even when source has right of subrogation); see also Overton, 619 F.2d at 1306 n.8 (same). Finally, we are compelled by the observation in Overton that "'it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tort feasor.'" 619 F.2d at 1306 (quoting Hamilton v. Slover, 440 S.W.2d 947, 958 (Mo. 1969)).

*Inclusion of attorney's fees*

Debtor also argues that the bankruptcy court improperly awarded the Ritters attorney's fees under § 523(a)(2)(A). Debtor notes that the bankruptcy court relied on In re Hunter, 771 F.2d 1126 (8th Cir. 1985), as authority for awarding attorney's fees in this case. In In re Hunter, this court noted that:

> when the parties have included a provision authorizing recovery of attorneys' fees in a contractual agreement, and those fees are incurred in connection with a debt determined to be nondischargeable in bankruptcy, some courts have permitted recovery of reasonable attorneys' fees as part of the compensatory relief to which a creditor is entitled under 11 U.S.C. § 523(a)(2)(A).

Id. at 1131 (citing cases). However, debtor argues, the Eighth Circuit merely remanded the case to the district court, which had affirmed the bankruptcy court's exclusion of post-petition fees. See id. Therefore, debtor argues, In re Hunter does not require this court to affirm the award of attorney's fees in the present case. Debtor further argues that attorney's fees should not be included within the nondischargeable debt under § 523(a)(2)(A) because requiring a bankruptcy debtor to pay the creditor's attorney's fees will have a chilling effect on bankruptcy filings and because creditors are generally better able to bear the cost of litigation than bankruptcy debtors. He also contends that he should not be bound under the attorney's fees provision of the base contract between the Ritters and TAG because he personally was not a party to that contract and, in fact, it was Goldford who signed the base contract on behalf of TAG.

We note that the base contract clearly states the parties' right to recover reasonable attorney's fees upon prevailing in any matter arising under the contract documents. The Ritters' attorney's fees were properly included in the nondischargeable debt under § 523(a)(2)(A) because attorney's fees provided by contract, like accrued interest, can become part of the debt. In re Hunter, 771 F.2d at 1131; cf. In re Fobian, 951 F.2d 1149, 1153 (9th Cir. 1991) ("[w]here a contract . . . provides for an award of attorneys' fees, a creditor may be entitled to such fees in bankruptcy proceedings"), cert. denied, 505 U.S. 1221 (1992). As to whether a factual basis exists to excuse debtor personally because he was not a party to the base contract or because Goldford signed it on TAG's behalf, we hold that the bankruptcy court's reasons to pierce TAG's corporate veil apply to this issue as well.

**Conclusion**

For the reasons stated, the order of the district court, affirming the orders of the bankruptcy court, is affirmed.  <u>See</u> 8th Cir. R. 47B.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.