**In re Bruce P. WYANT, Debtor.**

**Minnesota Client Security Board, on behalf of Minnesota Client Security Fund, Plaintiff,**

v.

**Bruce P. Wyant, Defendant.**

**Bankruptcy No. 98–43521.**

**Adversary No. 98–4246.**

United States Bankruptcy Court, D. Minnesota.

Aug. 2, 1999.

Janette K. Brimmer, Sarah Walter, Assistant Attorneys General, St. Paul, MN, for Plaintiff.

Bruce P. Wyant, Edina, MN, pro se.

## ORDER DETERMINING DISCHARGEABILITY OF A DEBT

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial to determine whether the defendant's debt to the plaintiff is excepted from his discharge under 11 U.S.C. § 523(a)(2)(A) or § 523(a)(4). Janette Brimmer and Sarah Walter, assistant attorneys general, appeared for the plaintiff. Bruce P. Wyant appeared *pro se*.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(1) and § 1334, and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

In 1981, attorneys Bruce Wyant and John Morgeson formed a law firm. They were each 50% shareholders in the firm of Wyant & Morgeson, P.A. The firm dissolved in 1993.

Annette and Steven Johnson were, and still are, the sole shareholders of a company called Those Little Donuts. TLD engages in the roving sale of mini-donuts on a circuit of fairs and similar events. The Johnsons and TLD were clients of the law firm. In 1991, Wyant and Morgeson, along with Annette Johnson, incorporated a company called Those Little Donuts International, Inc. The intended purpose of the company was to engage in larger scale sales of mini-donuts, as well as the manufacture and sale of mini-donut making machines.

Annette Johnson owned 50% of the TLDI stock and served as president; Morgeson owned 33⅓% of the TLDI stock and served as executive vice president; and Wyant owned 16⅔% of the TLDI stock and served as secretary-treasurer. Three creditors brought TLDI into bankruptcy on June 2, 1993, by filing an involuntary petition under Chapter 7.[1] Several loans at issue in this proceeding were made by clients of the firm to TLDI.[2]

In the early eighties, Morgeson began soliciting and obtaining loans from and between his friends and clients of the firm. The loans were numerous, but the loans at issue in this case were loans made by clients to the law firm or to TLDI, the principal amounts of which were never repaid and which resulted in claims to the Board.

The Board paid on claims by clients of Wyant & Morgeson, P.A., as follows: $100,000.00 (of $155,000.00 claimed) to Helen Ainsley; $19,000.84 (of $25,000.00 claimed) to Gerald and Mafalda Gerdon; $100,000.00 (of $445,000.00 claimed) to Robert Mockenhaupt; $80,225.00 (of $134,000.00 claimed) to William and Diana Bergen; $5,000.00 (in full) to Hugh Langevin; and $100,000.00 (of $125,000.00 claimed) to Bonnie and Myron Lofgren; $64,484.00 (of $210,000.00 claimed) to Eileen Zimmerman; and $79,212.00 (of $107,500.00 claimed) to Annette and Steven Johnson. In total, the Board paid $547,921 to clients of the firm. In this adversary proceeding, the Board seeks to recover that amount from Wyant.

### The Loans

■ Determining the frequency and nature of Wyant's involvement in actually procuring the loans is uncertain work. It

---

1. Helen Ainsley, Eileen Zimmerman, and Bonnie Lofgren, the three creditors who filed the involuntary petition against TLDI, were also clients and creditors of the law firm.

2. None of the claimants in this adversary proceeding filed proof of claims in the TLDI bankruptcy case, and none of them received a distribution, except Robert Mockenhaupt, who received $17,850 as a secured creditor.

is undisputed that Wyant never made any disclosures to any of the clients regarding conflict of interest, other client loans, the use of client loans for operating expenses and interest payments on other client loans, the principal interests Morgeson and Wyant held in TLDI, or the need for independent counsel or written informed consent.[3]

### Bergen

William Bergen testified that the loans he and his wife made to the firm and to TLDI were solicited primarily by Morgeson, that Wyant was "secondary" to Morgeson. Bergen first made a loan to Morgeson, personally, in 1984, in the amount of $10,000. He also made loans to Morgeson in the amounts of $60,000 and $25,000 (in 1987), and $55,000 (in 1991). On these loans Bergen received a total of $55,750 in interest payments, and $85,000 of the principal was repaid.

Bergen began loaning money to the firm in 1984, with a loan of $30,000. In 1986, he loaned another $10,000. In 1987, he loaned another $24,000. Bergen loaned $40,000 to the firm in 1991, and made another loan to the firm in 1992, for $10,000. The first three loans to the firm were consolidated and a new note issued in the amount $64,000, in February 1992. On these loans Bergen received a total of $61,390 in interest payments, but none of the principal was repaid.

In 1992, Bergen also made a loan to TLDI in the amount of $20,000. He received $1,400 in interest payments on this loan and the principal was not repaid. Bergen testified, as did all the claimants, that interest payments on the loans were made as scheduled and that there was no default until the dissolution of the firm in 1993.

Bergen indicated that Wyant was present at three of the meetings addressing the loans, and maybe a fourth. At one of the meetings Wyant was present only at the end, and purportedly stated that the firm was "viable" and that there was "nothing to worry about."

Bergen indicated that, at another meeting, Wyant stated that the firm had contingent fee cases with "handsome" payments in the firm's near future. Bergen testified that he relied on Wyant's personal guaranty. However, he also admitted that he never requested any financial disclosures regarding the firm or Wyant personally. He regarded both Morgeson and Wyant as his attorneys.

### Langevin

Hugh Langevin was a close friend of Morgeson's and considered Morgeson his attorney. Langevin loaned $5,000 to TLDI in 1993. He testified that Wyant did not participate in procuring the loan he made to TLDI or advise him in any way regarding the transaction. Langevin stated that he only named Wyant in his claim to the Board because Wyant was a co-shareholder of the firm.

### Lofgren

Bonnie Lofgren testified that she dealt exclusively with Morgeson regarding the loans she made out of her trust, but that Wyant came in at the end of the meetings and "schmoozed" while he signed the guarantees. Lofgren made two loans to TLD, Steven and Annette Johnson's original

---

3. Wyant relies on the argument that he did not have an attorney-client relationship with any of the claimants and therefore had no duty to them. This contention is simply wrong. Wyant was one of the claimants' two lawyers. He was a shareholder of the firm representing all the claimants, and he personally provided legal services to four of them. The Minnesota Supreme Court, in its opinion disbarring Wyant, considered the claimants to be both Wyant's and Morgeson's clients.

"Wyant and his partner took advantage of trusting clients to invest over $1.5 million in his financially precarious businesses: the Firm and TLDI." See In re Wyant, 533 N.W.2d 397, 401 (Minn.1995). Moreover, the Court relied on cases it deemed analogous in which the attorney-client relationship was expressly noted; and it relied on Minn.R.Prof.Conduct 5.1(c) which denotes what circumstances extend a lawyer's duties to clients of the firm served primarily by another partner.

Those Little Donuts company, in the amounts of $70,000 (in 1992) and $50,000 (in 1993).

She made two loans to TLDI, in the amounts of $50,000 (in 1992) and $75,000 (in 1993). The principal was never repaid, and she received interest payments from TLDI totaling $2,500.

She believed both Wyant and Morgeson were her attorneys even though she worked only with Morgeson on the loans. Lofgren says that she relied on Wyant's guarantees, although she never requested any disclosure regarding his or the firm's financial health.

### Mockenhaupt

Robert Mockenhaupt, a long-time close friend of Morgeson's, made loans to the firm starting in 1990 with a loan of $50,000, followed by loans of $100,000 and $65,000 in 1991 and 1992. He received $44,900 in interest payments and none of the principal was repaid.

Mockenhaupt made a $100,000 loan to TLD in 1990, and three loans to TLDI including $140,000 in 1991, and $40,000 and $50,000 in 1992. The three loans to TLDI were consolidated by a new note in the amount of $230,000 in 1993. Mockenhaupt received $36,000 in interest payments from TLDI, and nothing on the principal. Mockenhaupt also loaned $20,000 to Morgeson, personally, in 1992, and he made numerous loans to other clients of the firm.

Mockenhaupt couldn't recall specifically which meetings regarding loans Wyant may have attended. He remembered that Wyant was "usually" or "sometimes" present at the meetings. Mockenhaupt characterized Wyant's participation in the loan meetings as commenting on the "risk and return" analysis of the loans as investments. He contended that Wyant would make statements affirming Morgeson's assurances, attest to the condition of the business, be it the firm or TLDI, and comment on the condition of the TLDI machines. According to Mockenhaupt, Wyant stated that Mockenhaupt's loans to the firm and to TLDI were "negligible risk, healthy return." [4]

### Johnson

Annette and Steven Johnson,[5] the sole shareholders of TLD, became clients of the firm in 1983. The first Johnson loan to the firm was made in 1985, in the amount of $25,000. Johnson also made three loans to Morgeson personally, in the amounts of $5,000, $1,500, and $12,000 in 1987, 1988, and 1992, respectively. Between 1988 and 1990, TLD made ten loans to the firm, and one to Morgeson personally.

In 1991, when TLDI was formed, TLD began making larger and more frequent loans, this time seven loans to TLDI ($402,000 total) and three to Morgeson personally ($15,000 total). TLD received payments from the firm totaling $67,500, although it is unclear from the record whether the payments constituted interest or principal and to which loans they applied. In 1995, the Johnsons and TLD obtained a judgment against the firm in Hennepin County District Court in the amount of $6,188,571.49.

According to Annette Johnson, Morgeson solicited the loans, and counseled and advised the Johnsons regarding ways to invest their savings and the disposable wealth at hand from their TLD enterprise. Every instance addressed in her complaint to the Board identifies Morgeson as the counselor and refers to Wyant almost exclusively when describing the firm's failure to provide full material and professional disclosure.

---

4. Mockenhaupt's testimony of Wyant's involvement in his loans is at a great variance with that of all other claimants.

5. Annette Johnson's testimony from the disciplinary hearing was not admissible. However, the record includes other applicable evidence (e.g., promissory notes, Board complaint).

## Zimmerman

Eileen Zimmerman began making loans in 1985, with loans in the amount of $60,000, each, to Morgeson and to Wyant personally, and one loan in the amount of $130,000 to the firm. Wyant repaid the personal loan in May 1986. Zimmerman also made a loan to TLD in the amount of $15,000 in 1989, which was consolidated with another $30,000 loan made in 1991. Along with two more loans to the firm, in the amounts of $20,000 (in 1990) and $150,000 (in 1992), Zimmerman also made two loans to TLDI each in the amount of $30,000, both in 1992.

## Ainsley

Helen Ainsley, a long-time client of Morgeson's who counted on him for her financial planning, made numerous loans through the firm. In 1986, Ainsley loaned $60,000 to Wyant personally. On that loan, Wyant paid $32,400 in interest and the principal was repaid in full in 1990. In 1989, Ainsley loaned $10,000 to Morgeson personally, as well as $15,000 to TLD. Ainsley loaned $55,000 to TLD and $25,000 to TLDI in 1990.

That loan to TLDI and a subsequent loan to TLDI in the amount of $20,000 in 1991 were subsequently consolidated under a new note in the amount of $45,000 in 1992. Ainsley also made three additional loans to TLDI, in the amounts of $5,000, $60,000, and $20,000 in 1992. TLDI paid a total of $17,446 in interest to Ainsley, and repaid $5,000 of principal.

Ainsley made two loans to the firm, one in 1991 in the amount of $40,000 and another in 1992 in the amount of $10,000. Additionally, Ainsley made numerous loans, through Morgeson, to other clients. The firm made interest payments to Ainsley totaling $8,525 and repaid $20,000 of principal.

The testimony of Helen Ainsley, now deceased, was admitted by a transcript of the disciplinary hearing in August, 1994. Ainsley believed that Wyant performed the "figuring or accounting" elements of the loan transactions, yet she also indicated that Wyant did not provide the financial planning services that the firm provided to her. Ainsley believed that Morgeson was her lawyer and that only Morgeson solicited loans from her. Ainsley considered Wyant her accountant because he did her taxes. Interest payments were timely on the loans made by Ainsley, and the unpaid principal still owed to her at the time the firm dissolved was $155,000.

## Gerdon

The testimony of Gerald Gerdon was admitted by a transcript of the disciplinary hearing in August 1994. According to Gerdon, Morgeson, his friend of many years, initiated the loans to the firm and to TLDI, and Wyant was not involved in the discussions leading up to the loans. Gerdon believed that Morgeson was his attorney, except for a wrongful death action that Wyant brought regarding the death of Gerdon's father. Morgeson, not Wyant, told Gerdon that the loans were no-risk investments.

In 1983, Gerdon loaned the firm $25,000, which consolidated into a new note along with another loan in 1991. From 1983 to 1993, Gerdon received interest payments totaling $28,730 on that loan, but the principal was never repaid. Gerdon made a loan to Morgeson personally, in 1991, in the amount of $85,000 (secured by a mortgage and repaid in full in 1993 shortly after the demise of the firm). Finally, Gerdon loaned $40,000 to TLDI in 1992.

Overall the firm borrowed nearly $6 million from, and sometimes arranged loans between, its clients. Together these eight claims amount to approximately $2.5 million loaned to the firm, to Wyant or Morgeson personally, and to TLDI. Of that a little more than $1.2 million was not repaid. The Board paid these clients $547,921 on their claims.

Wyant personally guaranteed each of the relevant loans. The nature and extent of Wyant's involvement in the loan transactions, and the significance of his relation-

ship with the clients, are at the heart of this proceeding.

## Disbarment Proceeding

Ethical complaints were filed with the Lawyer's Board of Professional Responsibility against both Morgeson and Wyant. On his request, Morgeson was placed on disability status and has never been disciplined. The director of the Office of Professional Responsibility filed a petition with the Minnesota Supreme Court.

A referee appointed by the Minnesota Supreme Court held a disciplinary hearing in August 1994, and recommended that Wyant be disbarred for his conduct in connection with the loans.[6] Agreeing, the supreme court ordered his disbarment. Specifically, the Court found that Wyant's "conduct in continuing to sign, guarantee and accept the benefits of the loans ... at a minimum, ratified Morgeson's misconduct." *In re Wyant,* 533 N.W.2d 397, 400 (Minn.1995).

"Wyant took no action to remedy the situation even though he knew of the misconduct at a time when the injury could have been avoided or mitigated to the client." *Id.* at 401. The Court found that although "[c]learly Morgeson was more directly involved in the solicitation and execution of the loans than Wyant, however, that does not absolve Wyant for his own involvement." *Id.*

The Court ordered Wyant's disbarment because of his "unbelievable" and "incredible" violation of Minn. R. Prof. Conduct 5.1(c),[7] relying on Wyant's failure to disclose the firm's adverse interests, its financial condition, his personal financial condition for purposes of his guarantees, and the firm's reliance on the loans for operating expenses, and for his failure to recommend independent counsel for the clients and obtain written consents to the transaction from the clients. *Id.* at 399–402.

Although the referee found that Wyant's conduct constituted a pattern of fraud and dishonesty, the supreme court expressly limited its holding to a determination that Wyant had breached ethical and professional duties. *Id.* at 400–401. "We conclude that irrespective of whether Wyant's conduct constitutes criminal fraud, his conduct, as he admitted, violates Rules of Professional Conduct and Ethical Rules, thus causing unprecedented financial losses to clients of his firm. Thus, the appropriate sanction is disbarment." *Id.* at 401–402.

## The Client Security Fund

The Minnesota Client Security Fund is a fund established by the Minnesota Supreme Court to reimburse clients who suffer loss of money or other property from the dishonest conduct of their attorneys. All active Minnesota lawyers pay into the Client Security Fund. The Fund is administered by a Board appointed by the supreme court. The court has adopted written rules for the Client Security Board which the Board follows in its procedures and decisions. The Board has discretion in deciding what claims to pay and deny, and the amount of payment, subject to a maximum amount the Board may pay on a claim of $100,000.

The claimants all filed their claims against Wyant and Morgeson from April 1993 through March 1995, naming both

---

6. While the referee's findings and recommendation were part of an earlier summary judgment motion, they were never made a part of the trial record.

7. Minnesota Rule of Professional Conduct 5.1(c) provides: "A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) the lawyer orders or, with knowledge of specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner in the law firm in which the other lawyer practices, * * * and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take remedial action." *In re Wyant,* 533 N.W.2d at 400. The Court also noted that "knowledge," "knowingly," "known," or "knows" denotes actual knowledge of the fact in question, and that knowledge may be inferred from circumstances. *Id.,* citing Minn. R. Prof. Conduct Preamble.

Wyant and Morgeson. Martin Cole, an assistant director of the Board, testified that it was unusual for claims to be made against two attorneys. He explained that the Board's decision to pay claims is discretionary, and that a determination of a claim is based on a combination of investigation and consideration of collateral findings, such as disciplinary or criminal proceedings.

Accordingly, because Morgeson was transferred to inactive disability status and he was essentially shielded from disciplinary review, the Board had no disciplinary or other collateral findings against Morgeson to consider in its determination of the claims against him and against Wyant. The Board's determination of these claims, therefore, did not necessarily distinguish between Wyant's conduct and Morgeson's conduct.

The Board paid the client claims in full, in part, or up to the maximum allowable amount pursuant to the Board policy. The claims were determined and paid in August and September of 1995. Each claimant subrogated any interest in the underlying claim against the firm or the attorneys individually in favor of the Board.

The Board thereafter sought and obtained a judgment in Hennepin County District Court against Wyant in the amount of $534,710.23. Wyant filed a bankruptcy petition under Chapter 7 on May 27, 1998, and the Board filed this adversary proceeding on August 31, 1998. On May 28, 1999, I granted Wyant's summary judgment motion against the Board to the extent that it was based on Zimmerman's claim.[8]

### The Issues

Wyant's position in this proceeding is uncomplicated: his conduct with regard to the loans from the clients, even if it violated rules of professional responsibility and ethical rules, does not constitute a basis to except his debt to the Board from his discharge. Wyant contends that he never participated in discussions with the clients regarding loans by the clients to the firm or to TLDI and that therefore he never made any representations, false or otherwise, upon which any client could possibly have relied.

He contends that he was not generally present at meetings or teleconferences between Morgeson and any client at which loans were procured, discussed, or closed. He insists that he was never brought in by Morgeson to any meeting to discuss the risk of the loans or to comment on the financial health of the firm, and that his rare presence was at best momentarily and solely to sign a guaranty or merely to say hello.

Wyant also does not believe that he was in an attorney-client relationship with any of the clients in connection with the loans either directly, continuing from legal services he provided to some of the clients prior to their becoming creditors of the firm, or because of his status as the only other shareholder lawyer in the firm. Wyant admits that he knew about the loans, and he concedes that he understood a conflict to exist between Morgeson and the clients, yet he maintains his position that he, Wyant, was under no duty to make affirmative disclosures to the clients.

The Board argues that Wyant did participate in the meetings that resulted in the loans, and that his participation, even if largely composed of silence or omissions, constitutes a sufficient basis to except his debts to the clients, and therefore to the Board as their subrogee, from his discharge. The Board relies on the proposition that conduct conveying a false impression may amount to fraudulent misrepresentation.

The Board also contends that even if Wyant did not participate in discussions with the clients about the loans, his status as a borrower on the loans or his position as one of the clients' attorneys gave rise to a common law duty to make material dis-

8. Zimmerman's claim was tried in a separate adversary proceeding on April 12, 1999.

closures, the lack of which would constitute a fraudulent misrepresentation cognizable under § 523(a)(2)(A).

Finally, the Board asserts that Wyant's conduct determined by the Minnesota Supreme Court to violate of the Minnesota Rules of Professional Conduct is also conduct that constitutes fraud pursuant to § 523(a)(2)(A).

## DISCUSSION

### Dischargeability Under § 523(a)(2)(A)

Section § 523(a)(2)(A) provides that a discharge under section 727 does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." See 11 U.S.C. § 523(a)(2)(A).

 For a debt to be excepted from discharge pursuant to § 523(a)(2)(A), the creditor must prove the elements of fraud by a preponderance of the evidence. *Alport v. Ritter (In re Alport)*, 144 F.3d 1163, 1166 (8th Cir.1998). The plaintiff must show: (1) the debtor made a false representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor subjectively intended to deceive the creditor at the time he made the representation; (4) the creditor justifiably relied upon the representation; and (5) the creditor sustained injury as a proximate result of the misrepresentation. *See In re Alport*, 144 F.3d at 1167; *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

9. The evidence also indicated that the clients had shared a fair degree of collaboration in pursuing their remedies against Morgeson and Wyant following the demise of the firm, which tended to suggest a measure of borrowing of each other's circumstances and diluted individual credibility overall. Individually,

*Misrepresentations*

Wyant did not make any oral representations of significance to any of the clients. The testimony of clients varied. At best, Wyant may have rarely and momentarily entered a meeting to sign a guaranty. Perhaps he then expressed uncomplicated and superficial opinions, such as that the client had "nothing to worry about," or that the loan was "low risk, high return." The clients and the Board contend now that Wyant's presence and statements then conveyed to the clients a carefully planned impression that Wyant was unequivocally ratifying whatever Morgeson had stated prior to Wyant's appearance.

This fact was disputed at trial and Wyant was more credible.[9] I find that Wyant did not attend or participate in any of the meetings that resulted in loans from the clients, other than stopping in briefly to sign a guaranty, or making occasional minor comments about the transactions. He did not participate in a determinative or meaningful manner. It was Morgeson who solicited the loans and made any affirmative representations on which the clients relied.

What remains, therefore, is Wyant's silence and conduct, especially his signing of personal guarantees of the loans and his failure to make certain disclosures required of him by the Minnesota Rules of Professional Conduct. That is, while Morgeson was orchestrating the client loan system to fund the operations of the firm and provide capital for TLDI, Wyant was aware but complacent and generally uninvolved. He could have intervened, prepared financial statements, provided disclosures, or contacted the clients to discuss the transactions, but instead he did and said nothing.

however, each client consistently illustrated Morgeson as the eminent person involved in and controlling the solicitation and consummation of the loan transactions, and identified Morgeson as the chief, if not sole, source of information and trust.

■ "Fraud can be based on any type of conduct *calculated* to convey a misleading impression, thus, it is not relevant whether the representation is express or implied." *AT & T Universal Card Serv. v. Ellingsworth (In re Ellingsworth)*, 212 B.R. at 333, (emphasis added), citing *AT & T Universal Card Serv. v. Feld (In re Feld)*, 203 B.R. 360, 367 (Bankr.E.D.Pa. 1996); *AT & T Universal Card Serv. v. Alvi (In re Alvi)*, 191 B.R. 724, 732–33 (Bankr.N.D.Ill.1996). Accordingly, "silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under section 523(a)(2)(A)." *See Rezac v. Maier (In re Maier)*, 38 B.R. 231, 233 (Bankr.D.Minn.1984) (citations omitted).

■ "While it is certainly not practicable to require the debtor to 'bare his soul' before the creditor, the creditor has the right to know those facts touching upon the essence of the transaction." *See Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir.1987). Accordingly, "[a] borrower has the duty to divulge all material facts to the lender." *Id.*

The question is, therefore, twofold, and asks whether Wyant's conduct as a lawyer, and as a guarantor, amounted to a misrepresentation, by way of behavior conveying a false impression, for purposes of § 523(a)(2)(A). The conduct is the same under both inquiries. The conduct which purportedly conveyed a false impression was Wyant's silence, omission of material information and necessary disclosures, and general head-nodding commentary, which is the same conduct for which Wyant was disbarred.

The finding that Wyant violated professional and ethical rules, however, is a disciplinary finding and cannot serve as the basis for a finding of liability. An analysis of Wyant's conduct under § 523(a)(2)(A) must stand or fall on its own. Because the conduct violated professional and ethical rules does not necessarily mean that the conduct amounted to fraudulent conduct pursuant to the Bankruptcy Code.

The Board relies on the Ninth Circuit's opinion in *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 65 (9th Cir. BAP 1998), for the proposition that "an attorney's failure to disclose information that he has a duty to disclose under the professional responsibility rules may constitute a false representation of nondisclosure under § 523(a)(2)(A)." *See also Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir.1996)(failure to make disclosure required by the rules of professional responsibility constitutes a false representation under the first element of § 523(a)(2)(A)).

The *Fowler Brothers* opinion appears to hold that an attorney's nondisclosure in violation of a professional rule that he has a duty to make the disclosure is per se a misrepresentation for purposes of § 523(a)(2)(A), while the *Tallant* case holds that a nondisclosure rules violation *may* constitute a misrepresentation.[10]

The Scope of the Minnesota Rules of Professional Conduct, however, provides that "[v]iolation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty

---

10. In *Wilder v. Waller (In re Waller)*, 210 B.R. 370, 378–79 (Bankr.D.Colo.1997), the bankruptcy court reluctantly applied the Tenth Circuit's per se rule that a disclosure rule violation is a false representation under § 523(a)(2)(A), and noted that the Colorado professional rules scope language limits the effect of rules violations to disciplinary liability only.

Neither the *Tallant* nor the *Fowler Bros.* opinions refer to any language in the applicable professional rules regarding the limitation of liability under the rules to exclusively disciplinary. It is unlikely that the Court of Appeals in those cases rejected the scope of the applicable professional responsibility rules without discussing it, and I agree with the court in *Wilder* that more probably the provision was not brought to their attention and they accordingly failed to consider it.

has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability... [N]othing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extradisciplinary consequences of violating such a duty." Minnesota Rules of Professional Conduct (1997).

■ I agree with the Ninth Circuit to the extent that the conduct that happens to violate a rule of professional responsibility may also amount to a fraudulent misrepresentation under bankruptcy law, but the conduct itself must be separately evaluated and whether that conduct amounts to a violation of a professional ethical rule is irrelevant and may not serve as a basis for deeming the conduct a misrepresentation. The Minnesota Supreme Court has said as much in limiting the scope of its ethical rules.

■ Wyant's nondisclosures of conflicts must therefore be evaluated as potentially material omissions and not as breaches of professional rules. From that perspective, Wyant's conduct was careless and harmful by its failure to possibly prevent or mitigate injury, but it does not constitute misrepresentation for purposes of fraud. The distinguishing circumstances of this case include Wyant's overwhelming lack of involvement and the essential role occupied distinctively by Morgeson. Those facts minimize the actual significance and proximate effect of Wyant's actions. His conduct was unprofessional, but not fraudulent.

Wyant's conduct does not amount to a misrepresentation. While it surely violated professional and ethical rules and warranted disciplinary action, including his disbarment, it falls short of constituting misrepresentation for purposes of establishing an element of fraud under § 523(a)(2)(A).

The impression conveyed by his conduct is mostly apparent in retrospect. The clients who made the loans and the Board who paid the client claims can see today that Wyant's silence contributed to the clients' failure to ascertain and avoid the losses that resulted from lending money to the firm and to TLDI.

All the claimants were personal friends of Morgeson or considered him their primary attorney at the firm, or both. They trusted Morgeson and in making their decision to loan money, they relied on whatever he told them. Wyant, not being present for most of the meetings, did not know what Morgeson told the claimants or failed to tell them.

However, his actions, mostly a lack of action, during the time that the loan agreements were negotiated and executed, did not then amount to an impression. Perhaps if Wyant had sat silently throughout the entirety of every meeting, then his silence may have amounted to an impression that could be construed as an actual representation. But Wyant's silence was separate from the transactions.

Except for his guaranty, along with Morgeson's, for loans to the firm and, along with Morgeson's and Johnson's, on loans to TLDI, Wyant was almost entirely distinct from the business of client loans.

The Board relies on the Restatement definition of misrepresentation for the proposition that a party to a business transaction has a duty to make material disclosures to the other party before the transaction is consummated. See Restatement (Second) of Torts, § 551.

The problem is the same, however, in that Wyant, as one of more than one TLDI principal, and as one of two guarantors of loans to the firm, was simply not involved enough in the transactions to the extent that his silence and omission can be interpreted as anything other than simply a lack of involvement, much less a purposefully conveyed impression.

■ For an impression to rise to the level of a representation, it surely must be palpable, appreciable, and in fact recognized as such at the time it is supposedly conveyed. The testimony of the clients indicated that they basically didn't give much thought to Wyant at the time. His rare appearance or comment was "extra security". Yet, now the clients argue that his rare appearances and his lack of disclosures actually conveyed the impression of assurance.

■ The other readily troublesome problem, assuming the clients actually perceived an unmistakable impression from Wyant during the procurement of loans from them, is how to translate that impression into a representation that can be tested for veracity. If the impression represented that the transactions were safe or made good financial sense for the client, that is an opinion, not a representation of past or present fact.

■ If the impression represented that the firm was enjoying financial prosperity, that would be an unwritten statement of the debtor's financial condition, and therefore expressly excluded as a basis for fraud under § 523(a)(2)(A).

Did the clients get the impression from Wyant that the attorney-client relationship presented no conflicts with respect to the loans, that there was no basis for the clients to seek independent counsel, that no professional or ethical rules were being violated by Wyant or Morgeson, or that the loans would not be used for such things as paying the firm's operating expenses or the interest payments on loans from other clients?

Had Wyant uttered as much or uttered something that would necessarily imply the same, then I would have a misrepresentation to consider. Those would have been false statements of past or present facts. Those would constitute a failure by Wyant to disclose a fact, or the nonexistence of a fact, that he knew may justifiably induce the client to consummate or to refrain from consummating the transaction. *See* Restatement (Second) of Torts, § 551.

Wyant's conduct alone, however, simply could not have conveyed that kind of impression. The silence and omission in this case, under the circumstances of Wyant's typical complacence and absence, could not possibly have formed into and transmitted a definite impression. Admittedly, it is difficult to know what was represented to the client about the transactions because, whatever it was, Morgeson did the bulk of the representing. It is not difficult to determine that Wyant's behavior impressed very little upon the clients.

Finally, Wyant's failure to make disclosures, regardless of his professional and ethical duty to affirmatively do so, is also not necessarily fraudulent because it is not clear that he knew that disclosures had not been made by Morgeson. Wyant has not asserted that he thought Morgeson made the disclosures necessary to comply with professional and ethical rules and to avoid deceit, but neither was there argument or evidence that Wyant knew that Morgeson had not made those disclosures.

Wyant's lack of involvement in the transactions and Morgeson's consuming role comports with finding that Wyant's mostly muted, nescient, and invisible conduct did not impart an impression, much less a perceptible misrepresentation.

*Knowledge of Falsity*

Most of the misrepresentations that the clients allege Wyant made himself or ratified do not amount to past or present statements of fact. Most are opinions, and several are statements respecting the financial condition of the firm or TLDI, the latter of which are expressly prohibited from serving as a basis of nondischargeability under § 523(a)(2)(A).

The falsity of an opinion is not easily subject to determination, if at all, except in hindsight. In fact, an opinion cannot really be false at its moment of utterance because whether it is the right or wrong

assessment of a situation may only be finally evaluated, if at all, at some later time. An opinion may prove itself accurate or terribly wrong eventually, or it may languish eternally without consensus.

Whether the person who expressed the opinion knew it to be false when he expressed it, that is he did not in fact hold the opinion, is no less problematic. Perhaps if there were compelling circumstances to indicate that no reasonable person with that person's professional experience and sophistication could possibly have honestly held the offending opinion, then maybe it would be possible to find that the person did not, in fact, hold the opinion but merely pretended to hold the opinion.

There are no such certainties in this case, but only variables. If Wyant told clients that their investment by loaning money to the firm or to TLDI was a safe investment, a low risk and high return transaction, he believed as much. Interest payments were being made, he believed that the TLDI project was promising, and he was not keeping a daily watch over his partner's use of firm funds.

■ The evidence of Wyant's awareness of the firm's fiscal weaknesses is insufficient to find that Wyant actually knew that the firm and TLDI were doomed to financial failure and that the clients would necessarily suffer losses, or to find that Wyant did not believe the opinions he expressed, if he did actually express them. Again, there is no evidence to suggest that Wyant knew that Morgeson was not making full material disclosures to the clients.

■ The purpose of § 523(a)(2)(A) is not to punish a debtor who was wrong, even terribly wrong, but to protect creditors from debtors who knowingly misinform the creditor in such a way that induces the creditor to participate in the transaction. At best, any representations Wyant made by utterance, silence, or conduct, either statement of present fact or opinion, were merely wrong.

### Intent to Deceive

■ Even if Wyant's conduct or silence could be properly characterized as representations, and even if the falsity of those representations and Wyant's knowledge of that falsity at the time he made the representations were manifest, there remains the matter of Wyant's subjective purpose in making misrepresentations. In order for the debt to be excepted from Wyant's discharge pursuant to § 523(a)(2)(A), he must have knowingly made the misrepresentations or conveyed a false impression with the particular intent to deceive the clients.

■ Because "a promise necessarily carries with it the implied assertion of an intention to perform, it follows that a promise made without such an intention is fraudulent and actionable in deceit." *See Anastas v. American Savings Bank (In re Anastas* ), 94 F.3d 1280, 1285 (9th Cir. 1996), citing Restatement (Second) of Torts, § 530(1) cmt. c.

There is no evidence that, in promising to repay the client loans to the firm and to TLDI, personally as a guarantor or as a partner or principal of the borrower, Wyant did not subjectively intend and believe that the loans would be repaid.

Wyant admitted that he signed the many personal guarantees without any intention of ever actually repaying all of the loans pursuant to the guarantees. He believed, as all guarantors believe, that payment on the guarantees would not be necessary. Repayment would be accomplished by the firm or TLDI as borrower pursuant to the primary terms of the loans.

■ Moreover, a guarantor's promise to guarantee a debt is not his representation "that he has an ability to repay the debt; it is that he has an intention to pay. Indeed, section 523(a)(2)(A) expressly prohibits using a non-written representation

of a debtor's financial condition as a basis for fraud." *Id.*[11]

■ Accordingly, in determining Wyant's intentions, again assuming for the moment that he made misrepresentations by conduct, silence, or impression, "the focus should not be on whether the debtor [or the firm] was hopelessly insolvent at the time he made the representations." *Id.*

Wyant's knowledge of the fact that the firm was borrowing to pay operating expenses and borrowing to pay interest payments on other loans is therefore not determinative of his intentions in making misstatements as part of his participation in procuring loans from clients.

■ On the other hand, considering the overall financial condition of the debtor may be one element among many circumstances that could infer whether the debtor incurred the debt fraudulently. "[R]eckless disregard for the truth of a representation satisfies the element that the debtor has made an intentionally false representation in obtaining credit." *Id.* at 1286. However, "the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith." *Id.*

In other words, the fact that Wyant personally could not possibly have repaid all of the loans that he guaranteed is one indicator, but not solely determinative, of whether his intentions were deceitful.

■ There are other factors that suggest that Wyant did intend that all the loans would be repaid and that he did believe the transactions posed low risk high return investment opportunities for the clients. Interest payments on the loans were made regularly and on-time until the firm dissolved. The timely and substantial payments are inconsistent with

an intent to incur debt without repaying it. *See Anastas,* 94 F.3d at 1287.

Wyant testified that he was unaware, at least in time to prevent it, that Morgeson was increasingly drawing extra funds from the firm account. Wyant also genuinely believed that TLDI was going to take off and be an enormously lucrative success. Even as he was wrong, I find that Wyant did not intend with any of his actions to defraud the clients.

### *Justifiable Reliance*

■ The claimants did not rely at all, much less justifiably rely, on any representations by Wyant even if he made them. They relied on what Morgeson told them and in some cases on Wyant's guaranty, which in any event is a promise and not a statement of past or present fact.

Some of the clients in this case, although not all, are fairly sophisticated people, and, especially with respect to the loans made to the law firm, it was surprising that the clients, especially Mockenhaupt, did not require disclosure of even a minimal amount of financial information or other documentation before entering into the transactions.

Most of the clients were long-time friends of Morgeson and some of them were directly involved in the TLDI enterprise. If this case were about misrepresentations made by Morgeson, it would require considerable attention to the details of each client's relationship with Morgeson and of each discussion leading to the loan transactions in order to determine whether reliance on his misrepresentations was justified.

However, this case is about misrepresentations purportedly made to the clients by Wyant through an impression he gave from his silence and inactivity. But even if he did, they were de minimis. The real sell was coming from Morgeson. He solic-

---

**11.** As discussed earlier, this is why any representations Wyant made regarding his personal financial condition or the financial health or prosperity of the firm or TLDI do not constitute actionable representations under § 523(a)(2)(A) in any event, and his intentions in making such statements, if he did, are irrelevant.

ited every loan. He held meetings with every client regarding each loan. Each client received legal services from Morgeson either exclusively or primarily.

The testimony of the clients on the subject of Wyant's presence at meetings to discuss the loans and on the nature of his participation was inconsistent and not particularly credible. If Wyant attended any of these meetings, he entered merely to sign a guaranty and was only briefly present. If Wyant made any representations at these unlikely appearances, they were limited.

Most important, the testimony of the clients made it patent that Wyant's participation, whatever it was, did not constitute a determinative factor in their decisions to enter into the loan transactions. Wyant's personal guaranty and his purported assurances were repeatedly cited as "added" security. Moreover, none of the clients stated that they would not have entered the transaction without Wyant's guaranty, without his assurances, or even with disclosures that would have accurately characterized the inherent conflicts and risks of the loans.

All of the clients entered into the transaction because of whatever Morgeson was telling them and based on their trust in him. None of clients relied on representations made by Wyant, and if they did, it was at most only in small part, and clearly not fatefully. In any event, under the circumstances of Morgeson's overwhelmingly dominant and conclusive role in procuring the loans from the clients, relying on Wyant's minor participation would not be justified.

Dischargeability Under § 523(a)(4)

The Bankruptcy Code provides that a debt will be excepted from discharge under section 727 if the debt was "for fraud or defalcation while acting in a fiduciary capacity...." *See* 11 U.S.C. § 523(a)(4).

 Although Wyant argued that he did not have an attorney-client relationship with any of the clients with respect to the loan transactions, I find that he did have that fiduciary relationship with the clients, the source of which was his co-shareholder position with the firm, and the prior and ongoing legal services provided to the clients by him personally or by his firm.

 While Wyant had the fiduciary relationship necessary under § 523(a)(4), the Board has not demonstrated that the loans were obtained by Wyant's actual fraud. Nor has the Board offered evidence to support a finding of defalcation. "Defalcation is the misappropriation of trust funds or money held in any fiduciary capacity and the failure to properly account for such funds." *See Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir.1997). "Under section 523(a)(4), defalcation 'includes the innocent default of a fiduciary who fails to account fully for money received.' ... An individual may be liable for defalcation without having the intent to defraud." *Id.* (citations omitted).

 No client money was "held by the firm" as a result of the loans made by clients to the firm and to TLDI, and therefore no defalcation of trust funds occurred. The money was not "held" at all; it was transferred. The clients loaned money to an entity with which they happened to otherwise have a fiduciary relationship. While both Wyant and Morgeson had fiduciary duties to the clients, those duties were not derived from the loan transactions. The fiduciary relationship arose out of the firm's provision of legal services to the clients rather than from its position as a borrower.

## CONCLUSION

There is no doubt that Wyant was negligent in conducting himself as a co-shareholder lawyer in the firm and as a principal of TLDI throughout the duration of the client lending scheme. Nor do I question the Minnesota Supreme Court's decision to disbar him. There is no question that he failed to follow professional and

ethical rules. However, while there may be cases in which a lawyer's professional and ethical violations constitute fraud under § 523(a)(2)(A), this is not such a case.

## ORDER

THEREFORE IT IS ORDERED: The defendant's debt to the plaintiff is not excepted from his discharge.

LET JUDGMENT BE ENTERED ACCORDINGLY.