Joseph G. Rosania, Jr., United States Bankruptcy Judge
John D. Rockefeller once said: "A friendship founded on business is better than a business founded on friendship."
At issue in this proceeding is whether a debt that stems from two loan transactions is excepted from discharge under 11 U.S.C. § 523(a)(2)(A). The Court has jurisdiction over this core matter pursuant to 28 U.S.C. § 157(b)(2)(I) and 28 U.S.C. § 1334.
The Court, having considered the evidence in the form of testimony and exhibits submitted at trial, makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.
FINDINGS OF FACT
Steve Postovit ("Mr. Postovit") is a small business owner who previously worked in the financial services industry and has completed two years of college. Since 2009, Mr. Postovit has owned and operated a tire shop in Kalispell, Montana. Prior to relocating to Kalispell in 2004, he owned and operated a restoration business that remediated damage to commercial and residential properties caused by fire, flood, and mold. Between 2004-2008, Mr. Postovit received training to be an investment advisor at Edward Jones and worked as a licensed investment advisor at Merrill Lynch. His duties at Merrill Lynch included facilitating retirement plans, mutual funds, and other investments. Mr. Postovit also held investments of his own through Edward Jones, which included stocks, bonds, and mutual funds.
Holly Diane Bolling ("Ms. Bolling") relocated to Kalispell, Montana in 1994 and resided there until 2008. Ms. Bolling has been employed as a flight attendant for approximately twenty-nine years. She also has an architecture degree and previously worked for an architecture firm. In addition to working as a flight attendant, Ms. Bolling earned a living between 2004-2008 by "flipping" real estate. Ms. Bolling "flipped" approximately five properties by herself and another fifteen properties with her then-husband, Marc Bolling ("Mr. Bolling"), before they divorced in 2009. Mr. Bolling owned a construction company and earned a living by building homes. When she "flipped" properties with Mr. Bolling, Ms. Bolling designed and drafted construction drawings for the homes that Mr. Bolling built. Ms. Bolling also purchased properties, took out loans, signed promissory notes, and executed trust indentures *842 in connection with her and Mr. Bolling's "flips."[1]
Between 2004-2008, Mr. Postovit and Ms. Bolling lived approximately fifteen minutes apart from one another with their respective families. They were two of about thirty families who lived near and around Ashley Lake year-round. Ms. Bolling owned a home and two adjacent parcels of land in the subdivision Karrow Ashley Estates. Mr. Postovit's home is located in the subdivision Emerald Point.
Mr. Postovit and Ms. Bolling met in late-2004 at a community social engagement that they attended with their families. Thereafter, they socialized together at dinners and parties at one another's homes and the homes of mutual friends. Their daughters also carpooled to school together, played together, and had periodic sleepovers.
At trial, Mr. Postovit and his wife, Tara Postovit ("Mrs. Postovit"), testified that they were "very close" friends with the Bollings (Trial Tr. 22:11-23; 63:23-64:11). Ms. Bolling disputed the closeness of their relationship and testified that there were always other people present when they socialized with the Postovits (Trial Tr. 94:20-95:13). However, Mr. Postovit and Mrs. Postovit both independently testified that they once flew in Mr. Bolling's personal plane to have dinner out-of-state (Trial Tr. 22:5-6; 63:20-21), and Mr. Postovit also testified that he flew with Mr. Bolling for an out-of-state hunting trip (Trial Tr. 22:6-8). Ms. Bolling testified that she did not recall taking any trips with the Postovits in Mr. Bolling's plane because Mr. Bolling "didn't take [Ms. Bolling] on his plane" (Trial Tr. 95:14-18).
Through their social relationship, Mr. Postovit learned that the Bollings "flipped" real estate for a living and appeared to be successful at doing so. Specifically, Mr. Postovit knew that the Bollings had designed and built homes for at least four mutual friends, and that one such friend had profited by investing in one of the Bollings' "flips." Mr. Postovit was also aware that the Bollings had designed and built properties outside of Kalispell and outside of Montana.[2]
I. The Loan Transactions
In the spring of 2007, the Postovits and Bollings discussed the prospect of Mr. Postovit investing in one or more of the Bollings' "flips." At that time, Mr. Postovit had no real estate investment experience and had only purchased two homes, subject to secured mortgages, for himself and his family. One night while the Postovits were at the Bollings' home for dinner, Mr. Bolling and Mr. Postovit walked together to see certain lots north of the Bollings' home that Mr. Bolling represented he and *843 Ms. Bolling intended to "flip." Mr. Postovit agreed that he would make a loan to invest in "flipping" one of the lots, and, depending on the outcome of the first "flip," Mr. Postovit might make another loan to invest in "flipping" the second lot.
Ultimately, Mr. Postovit made two loans to invest in "flipping" both lots. Mr. Postovit took a second mortgage out on his home to fund the loans. The terms of the loans were negotiated by and between Mr. Postovit and Mr. Bolling. Ms. Bolling was not party to the negotiations. Ms. Bolling disputed that she had any knowledge of the business dealings between Mr. Postovit and Mr. Bolling outside of misinformation that she received from Mr. Bolling. The loans were documented by two promissory notes drafted by Mr. Bolling's attorney.[3] It is undisputed that the lots Mr. Postovit believed he was investing in-those shown to him by Mr. Bolling-were not the lots that were referenced in either of the promissory notes. Rather, the promissory notes referenced the two lots adjacent to Ms. Bolling's home in Karrow Ashley Estates.
a. The April 13, 2007 Note
The first promissory note was executed on April 13, 2007, by Ms. Bolling in favor of Mr. Postovit for a $ 150,000 loan (Pl.'s Ex. 3; the "April 13 Note"). The April 13 Note reflects that the principal, together with 25% interest, is payable upon the sale of "Lot 4 of Karrow Ashley Estates, Kalispell, Flathead County, Montana" ("Lot 4 of Karrow Ashley Estates"). The April 13 Note also provides that it is secured by a trust indenture on real property located at Lot 4 of Karrow Ashley Estates. The April 13 Note bears Ms. Bolling's signature as "BORROWER," Mr. Postovit's signature as "LENDER," and is notarized by a notary public.
Both Mr. Postovit and Mrs. Postovit independently testified that the April 13 Note was executed at Wells Fargo bank, and that Ms. Bolling was present (Trial Tr. 28:22-29:4; 66:21-67:20). Mr. Postovit further testified that he witnessed Ms. Bolling sign the April 13 Note (Trial Tr. 28:24-29:1). Ms. Bolling testified that she did not recall meeting Mr. Postovit at Wells Fargo Bank (Trial Tr. 118:2-119:10) or signing the April 13 Note, but she conceded that where a document is notarized, a notary generally must confirm the signatory's identity and witness the signing of the document (Trial Tr. 96:18-97:7).
In connection with the April 13 Note, Mr. Postovit made out a check, dated April 13, 2007, to Investment Land Group in the amount of $ 150,000 (Pl.'s Ex. 2; the "April 13 Check"). The April 13 Check was endorsed by "Holly Bolling as VP Inv. Land Group LLC." Ms. Bolling testified that she was, in fact, the vice president of Investment Land Group, LLC (Trial Tr. 103:23-25). Investment Land Group, LLC's sole member was Global Investment Enterprises, LLC (Pl.'s Ex. 13), an entity through which the Bollings developed land (Trial Tr. 90:23-91:2), which was solely owned by Ms. Bolling (Trial Tr. 87:19-91:5). Ms. Bolling testified at a prior deposition that she believed she and Mr. Bolling had 50/50 ownership interests in Global Investment Enterprises, LLC (Trial Tr. 89:6-14). However, Ms. Bolling testified at trial that she *844 subsequently learned Mr. Bolling put Global Investment Enterprises, LLC in her name without her knowledge (Trial Tr. 87:19-88:9).
Mr. Postovit testified that the April 13 Check was executed at Wells Fargo Bank immediately following the execution of the April 13 Note (Trial Tr. 32:4-24). Ms. Bolling testified that she "did pick up" the April 13 Check from Mr. Postovit and put it under Mr. Bolling's office door (Trial Tr. 99:17-18). Ms. Bolling also testified that the endorsement looked familiar and she "could have endorsed" the April 13 Check, but that she was not "sure" she had endorsed the April 13 Check (Trial Tr. 99:25-100:2; 103:16-19). Ms. Bolling testified that she received no benefit from the April 13 Check (Trial Tr. 156:8-19).
At the time the April 13 Note was executed, Ms. Bolling owned Lot 4 of Karrow Ashley Estates, which was one of the parcels of land adjacent to her home. At no time was a trust indenture executed in favor of Mr. Postovit with respect to Lot 4 of Karrow Ashley Estates. Mr. Postovit testified that he never requested documentation or other proof of the executed trust indenture for Lot 4 of Karrow Ashley Estates because "[the Bollings] were the experts in the real estate business," and he "gave them the money and trusted them that they would do what they said they were going to do" (Trial Tr. 35:2-23).
On the same day that the April 13 Note was executed, the Bollings executed a trust indenture for Lot 4 of Karrow Ashley Estates in favor of Park Side Federal Credit Union (Pl.'s Ex. 4; the "Park Side Trust Indenture"). The Park Side Trust Indenture bears Ms. Bolling and Mr. Bolling's signatures as "Grantor[s]" and is notarized by a notary public. Ms. Bolling does not dispute that she executed the Park Side Trust Indenture (Trial Tr. 97:25-98:6; 108:21-109:1). Mr. Postovit was unaware of the Park Side Trust Indenture.
On or about September 10, 2007, Ms. Bolling sold Lot 4 of Karrow Ashley Estates to an unrelated third party. Mr. Postovit was unaware of the sale. Nothing was paid to Mr. Postovit under the April 13 Note after Lot 4 of Karrow Ashley Estates was sold.
b. The April 27, 2007 Note
The second promissory note was executed two weeks after the April 13 Note on April 27, 2007, by Mr. Bolling in favor of Mr. Postovit for a $ 100,000 loan (Pl.'s Ex. 5; the "April 27 Note"). The April 27 Note reflects that the principal, together with 25% interest, is payable upon the sale of "Lot 2 of Karrow Estates, Kalispell, Flathead County, Montana" ("Lot 2 of Karrow Ashley Estates"). The April 27 Note also provides that it is secured by a trust indenture on real property located at Lot 2 of Karrow Ashley Estates. The April 27 Note bears Mr. Bolling's signature as "BORROWER," no signature by Mr. Postovit, and is notarized by a notary public.
Mr. Postovit testified that he received the April 27 Note when Ms. Bolling brought it to the lobby of Mr. Postovit's then-employer, Merrill Lynch (Trial Tr. 33:11-14). Ms. Bolling disputed any involvement with the April 27 Note. Specifically, she testified that she had never been to Mr. Postovit's place of business "in [her] life," and that she did not know where he worked at that time (Trial Tr. 117:13-21).
In connection with the April 27 Note, Mr. Postovit made out a check, dated March 30, 2007, to Investment Land Group in the amount of $ 100,000 (Pl.'s Ex. 1; the "March 30 Check"). The March 30 Check was endorsed by "H Bolling as VP Investment Land Group LLC." The Court notes that the endorsements on the April 13 Check and the March 30 Check differ in both substance and form. To wit, the April *845 13 Check was endorsed by "Holly Bolling as VP Inv. Land Group LLC," and the handwriting of the two endorsements does not appear to be the same.
Notwithstanding the date discrepancies, Mr. Postovit testified that he executed the March 30 Check and gave it to Ms. Bolling at the same time that she delivered the April 27 Note (Trial Tr. 33:15-22). Mr. Postovit was unable to explain why the April 27 Note and the March 30 Check bore different dates (Trial Tr. 33:23-34:5). Ms. Bolling testified that she "never touched" the March 30 Check (Trial Tr. 99:10; 136:21-137:4). Ms. Bolling also testified that she did not endorse the March 30 Check (Trial Tr. 103:6-18; 119:16-120:1), and that she has maintained as much since a prior deposition in 2008 (Trial Tr. 120:9-121:6). Ms. Bolling further testified that she did not deposit the March 30 Check (Trial Tr. 137:8-23).
At the time the April 27 Note was executed, Ms. Bolling owned Lot 2 of Karrow Ashley Estates, which was one of the parcels of land adjacent to her home. Ms. Bolling testified that Lot 2 of Karrow Ashley Estates contained the septic system for her home and, therefore, was inseverable from the lot where her home was located (Trial Tr. 127:6-9; 160:20-21). Ms. Bolling testified that she did not give Mr. Bolling permission to pledge Lot 2 of Karrow Ashley Estates as collateral for a promissory note, and that he otherwise had no authority to do so because he had no ownership interest in Lot 2 of Karrow Ashley Estates (Trial Tr. 130:24-131:14).
At no time was a trust indenture executed in favor of Mr. Postovit with respect to Lot 2 of Karrow Ashley Estates. Mr. Postovit testified that he never requested documentation or other proof of the executed trust indenture for Lot 2 of Karrow Ashley Estates because he trusted the Bollings (Trial Tr. 35:2-23).
On August 20, 2007, a trust indenture for Lot 2 of Karrow Ashley Estates was executed in favor of Stratus A, LLC, effective June 1, 2007 (Pl.'s Ex. 6; the "Stratus A Trust Indenture"). The Stratus A Trust Indenture pledges Lot 2 of Karrow Ashley Estates as security for a $ 456,000 loan, pursuant to the terms of a promissory note dated August 20, 2007. The Stratus A Trust Indenture bears Ms. Bolling's signature as "Grantor" and is notarized by a notary public. On the same day that the Stratus A Trust Indenture was executed, Lot 2 of Karrow Ashley Estates was transferred back to Ms. Bolling from Stratus A, LLC through a deed of reconveyance (Pl.'s Ex. 7). Ms. Bolling's name is misspelled on the deed of reconveyance. Mr. Postovit had no knowledge of the Stratus A Trust Indenture or the deed of reconveyance.
Ms. Bolling testified that she believes Stratus A, LLC is the entity through which Mr. Bolling owns his personal plane (Trial Tr. 110:16-18). Ms. Bolling further testified that she did not recognize the Stratus A Trust Indenture, and she disputed having executed the Stratus A Trust Indenture (Trial Tr. 110:3-111:22). Ms. Bolling testified that she believed her signature on the Stratus A Trust Indenture was forged (Trial Tr. 111:3-22). Ms. Bolling testified that she did not borrow $ 456,000 and had no knowledge of a promissory note dated August 20, 2007 (Trial Tr. 152:22-153:12).
On December 19, 2007, Ms. Bolling executed a deed of trust for Lot 2 of Karrow Ashley Estates in favor of Freedom Bank as security for a $ 405,268 loan (Pl.'s Ex. 8). Ms. Bolling does not dispute that she pledged Lot 2 of Karrow Ashley Estates as security for this loan (Trial Tr. 111:25-112:2). Mr. Postovit had no knowledge of the deed of trust.
*846 II. The State Court Proceeding
After the Postovits learned through a mutual friend and independent investigation that Lot 4 of Karrow Ashley Estates had been sold (Trial Tr. 36:17-37:18; 68:16-70:11), Mr. Postovit issued a demand letter to the Bollings for full payment of the principal, interest, and a penalty pursuant to the April 13 Note and the April 27 Note (Pl.'s Ex. 9). Receiving no response, Mr. Postovit filed suit against the Bollings for breach of contract, fraud, resulting/constructive trust, and conversion in Montana State Court on April 18, 2008 (Pl.'s Ex. 10; the "State Court Proceeding").
Ms. Bolling was deposed in the State Court Proceeding. Ms. Bolling testified that based on conversations with Mr. Bolling, she arrived at her deposition believing not that she was being deposed, but that she was attending a meeting with Mr. Postovit and Dannel Ockey ("Mr. Ockey"), who had developed the Emerald Point subdivision where Mr. Postovit resides (Trial Tr. 90:16-22; 105:25-106:12; 134:17-22; 135:7-136:1). Ms. Bolling testified that she believed the purpose of the "meeting" was for Mr. Postovit to "switch lots" because he was not happy with a lot that he had purchased from Ms. Bolling in Emerald Point (Trial Tr. 106:6-9; 113:6-11; 133:6-11; 135:9-13).
Ms. Bolling testified that, prior to the deposition, she had owned Lot 4 of Emerald Point for approximately 30 days due to a temporary transfer of ownership from Mr. Ockey (Trial Tr. 128:4-7). Ms. Bolling further testified that Mr. Ockey had transferred Lot 4 of Emerald Point to her so that she could design a home on the lot as an "owner build," which required pulling fewer permits (Trial Tr. 127:16-128:1). Ms. Bolling testified that it was this lot that she had contracted to sell Mr. Postovit for $ 150,000, a sale which she believed was coordinated by Mr. Bolling and Mr. Ockey (Trial Tr. 105:15-17; 108:1-11; 128:21-23; 133:21-134:2; 134:7-8; 138:19-139:6; 161:2-4). Ms. Bolling testified that she had never contracted with Mr. Postovit for him to loan funds to be secured by Lot 4 of Karrow Ashley Estates (Trial Tr. 105:15-17; 134:10-12; 136:11-20).
Ms. Bolling testified that she was not served with, and otherwise did not receive, notice of the State Court Proceeding and was not aware of the allegations therein until she attended the deposition (Trial Tr. 134:23-135:6; 155:6-10). Throughout the deposition, Ms. Bolling maintained that she was being questioned about the wrong lot-Lot 4 of Karrow Ashley Estates-when the lot that she had sold Mr. Postovit was Lot 4 of Emerald Point (Trial Tr. 105:11-18; 107:16-23; 128:24-129:9; 149:10-151:12; 171:8-18). Ms. Bolling testified that she first became aware at her deposition that Mr. Bolling had been lying to her about the transactions with Mr. Postovit (Trial Tr. 106:14-23).
Thereafter, Mr. Postovit moved for summary judgment in the State Court Proceeding (Pl.'s Ex. 11). On September 8, 2008, after the Bollings failed to respond, the Montana State Court entered judgment jointly and severally against Ms. Bolling and Mr. Bolling in the total amount of $ 236,364.53 (Pl.'s Ex. 12; the "State Court Judgment"). The State Court Judgment makes no specific findings and does not state the basis upon which it was entered.[4] Mr. Postovit subsequently domesticated the State Court Judgment in Colorado, where Ms. Bolling presently resides.
*847 III. The Bankruptcy Case and Adversary Proceeding
On August 3, 2017, Ms. Bolling filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.
Mr. Postovit timely commenced the instant adversary proceeding against Ms. Bolling on November 3, 2017. Mr. Postovit alleged that Ms. Bolling intentionally made false statements and representations to Mr. Postovit to induce him to loan money to Ms. Bolling, such that the entire State Court Judgment, including accrued post-judgment interest, should be excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). Since its entry, the State Court Judgment has accrued interest at a rate of 10% per annum. As of the date Mr. Postovit filed a proof of claim in Ms. Bolling's bankruptcy case, Ms. Bolling owed Mr. Postovit $ 416,583.28 (Claim 1-1).
On September 14, 2018, Mr. Postovit moved for summary judgment in the instant proceeding. Thereafter, Ms. Bolling filed a response, and Mr. Postovit filed a reply.
Mr. Postovit argued that he satisfied the reliance requirements of both 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B) because he had a preexisting relationship with Ms. Bolling, and there were no red flags to alert Mr. Postovit that he should further investigate the representations made in connection with the transactions. With respect to the intent requirements, Mr. Postovit argued that Ms. Bolling's deceptive intent could be inferred from the totality of the circumstances, and that Ms. Bolling at least acted with reckless disregard for the truth by signing a false promissory note and aiding Mr. Bolling in defrauding Mr. Postovit.
Ms. Bolling disputed any deceptive intent on her part because Mr. Bolling, not Ms. Bolling, negotiated all aspects of the transactions with Mr. Postovit. For that reason, and because Ms. Bolling had consistently maintained that she was confused about which lot was being purchased and the details of the transactions, she also disputed whether Mr. Postovit's reliance was reasonable or justifiable.
The Court entered an Order Denying Mr. Postovit's Motion for Summary Judgment on November 15, 2018 (Doc. No. 32; the "Summary Judgment Order"). In doing so, the Court found that Mr. Postovit failed to establish a material element of 11 U.S.C. § 523(a)(2)(B) because "the April 13 Note and the April 27 Note, and the statements contained therein regarding the execution of trust indentures, are not statements 'respecting the [Defendant's] financial condition.' " The Court also found that genuine issues of material fact regarding Mr. Postovit's reliance and Ms. Bolling's intent precluded entry of summary judgment under 11 U.S.C. § 523(a)(2)(A). Specifically, the Court found that additional evidence and testimony was necessary regarding the extent of the parties' social and familial relationship, the degree of their sophistication and business acumen, and the extent of Ms. Bolling's involvement in any fraudulent scheme that may have been perpetrated by Mr. Bolling.
A trial was held in this matter on February 13, 2019. At the outset of trial, Mr. Postovit informed the Court that, in light of the Summary Judgment Order, he would proceed only with his claim under 11 U.S.C. § 523(a)(2)(A).
At trial, Ms. Bolling testified that both she and Mr. Postovit were victims of a fraudulent scheme perpetrated by Mr. Bolling (Trial Tr. 106:14-17). As set forth above, Ms. Bolling testified that based on conversations with Mr. Bolling, she believed that she had sold Mr. Postovit Lot 4 of Emerald Point, not that she had contracted *848 for Mr. Postovit to loan funds to be secured by Lot 4 of Karrow Ashley Estates. Ms. Bolling testified that she had certain documents, including a land sale contract for Lot 4 of Emerald Point, which would have substantiated her testimony, but that said documents were stolen from her home during a break-in (Trial Tr. 131:21-132:10; 140:15-20). Ms. Bolling testified to a contemporaneous police report made in September 2008 which corroborates the break-in and theft of documents and names Mr. Bolling as the suspect (Trial Tr. 132:6-7; 139:7-140:20). Ms. Bolling also testified regarding credit cards and loans taken out in her name by Mr. Bolling; Mr. Bolling's use of her name, likeness, and Social Security number; and contemporaneous correspondences which corroborate the same (Trial Tr. 140:21-143:14; 144:5-147:9; 147:25-149:9).
CONCLUSIONS OF LAW
11 U.S.C. § 523(a)(2)(A) provides, in pertinent part, that a Chapter 7 debtor is not discharged from any debt for money or an extension of credit to the extent that such debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Notably, the term "actual fraud" has been expanded to encompass "forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." Husky Int'l Elecs., Inc. v. Ritz , --- U.S. ----, 136 S. Ct. 1581, 1586, 194 L.Ed.2d 655 (2016).
To establish a non-dischargeable claim under 11 U.S.C. § 523(a)(2)(A), a creditor generally must prove the following:
(1) the debtor made a false representation; (2) with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the false representation resulted in damages to the creditor.
In re Denbleyker , 251 B.R. 891, 895 (Bankr. D. Colo. 2000) (citing Field v. Mans , 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ; Fowler Brothers v. Young (In re Young) , 91 F.3d 1367, 1373 (10th Cir. 1996) ). These elements must be proved by a preponderance of the evidence. Grogan v. Garner , 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "[E]xceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." Bellco First Federal Credit Union v. Kaspar (In re Kaspar) , 125 F.3d 1358, 1361 (10th Cir. 1997) (citation omitted).
In the present case, it is undisputed that false representations were made in the April 13 Note, the April 27 Note, and during the negotiations thereof. It is also undisputed that Mr. Postovit relied on, and was damaged by, the false representations. What remains at issue is whether Ms. Bolling, who was not directly involved in the negotiations, possessed deceptive or fraudulent intent, and whether Mr. Postovit's reliance on the false representations was justifiable.
I. Intent to Deceive
In the marital context, courts are generally reluctant to impute fraudulent intent from one spouse to the other so as to prevent the discharge of the innocent spouse's debt. Batesky v. Wright (In re Wright) , No. 08-06052-JKC-7, 2011 WL 2160750, at *2 (Bankr. S.D. Ind. May 27, 2011). Indeed, courts have found that "more than the marital relation is needed to impute liability when [an] 'innocent spouse defense' is asserted." Ruiz v. Kennedy (In re Kennedy) , 566 B.R. 690, 724 (Bankr. D.N.J. 2017) ; see also *849 Melhorn v, Copeland (In re Copeland) , 291 B.R. 740, 769 (Bankr. E.D. Tenn. 2003) ("[T]here is no doubt that a married person may be authorized to act for the other spouse, but authority in this connection will not be implied from the marital relation.").
When spouses have a business relationship, however, many courts have applied some variety of agency law to impute fraudulent intent under 11 U.S.C. § 523(a)(2).[5] Wright , 2011 WL 2160750, at *3 ; see also Love v. Smith (In re Smith) , 98 B.R. 423, 426 (Bankr. C.D. Ill. 1989) (holding that husband's fraudulent used-car sale was imputable to wife, preventing discharge of debt under 11 U.S.C. § 523(a)(2)(A), because dealership license was in wife's name and wife's signature was required on business checks); W.E. Davis Co. v. Medow (In re Medow) , 26 B.R. 305, 307 (Bankr. S.D. Fla. 1982) (finding that although wife may have lacked actual knowledge that husband submitted a false financial statement on behalf of corporation, she had intent to deceive under 11 U.S.C. § 523(a)(2)(B) because of her role as corporate secretary).
In Kennedy , a husband and wife considered themselves business partners in various real estate ventures. Kennedy , 566 B.R. at 696. The husband acquired properties at foreclosure sales, rehabilitated them, and sold them for profit. Id. The business was funded through mortgage and construction loans from banks and institutional lenders, as well as loans from friends, relatives, and colleagues of the husband and/or wife. Id. Due to the husband's previous bankruptcy filing and poor credit, many of the properties were financed and titled in the wife's name, with her knowledge and consent. Id. The wife participated in loan and mortgage closings when necessary but gave her husband unlimited authority to sign her name on documents and checks in connection with the business. Id.
The husband defrauded several non-institutional investors by, inter alia , using loan proceeds for purposes other than what was intended, failing to record security interests pursuant to the terms of promissory notes, and retaining for personal use profits which should have been paid to investors. Id. at 699-707. On the issue of whether the husband's fraudulent intent could be imputed to the wife, the court concluded that "liability may be found where the spouse claiming innocence was involved in the business or related transactions or participated in the benefits of those transactions." Id. at 724. Although the wife claimed to have limited involvement in the business, the court emphasized that she gave her husband unlimited authority to sign her name on documents and checks in connection with the business, participated in certain closings, made false assurances directly to an investor, and used some of the proceeds of the transactions for her personal benefit. Id. at 724-25. The court denied the discharges of both the husband and wife under 11 U.S.C. §§ 727(a)(2), (3), and (7) but noted that it would have found certain of their debts non-dischargeable under 11 U.S.C. § 523(a)(2)(A) if necessary. Id. at 727-28.
Nevertheless, in applying principles of agency law to impute fraudulent intent from one spouse to the other, courts have found that the fraud must fall within *850 the scope of the agency relationship between the spouses. See e.g. , Fluehr v. Paolino (In re Paolino) , 75 B.R. 641, 650 (Bankr. E.D. Pa. 1987) (holding that if husband acted as agent for wife in transaction to secure financing for joint business endeavor, any fraud by husband committed within the scope of the agency relationship may be imputed to wife for purposes of 11 U.S.C. § 523(a)(2)(A) ); see also Maynard Savings Bank v. Banke (In re Banke) , 275 B.R. 317, 330 (Bankr. N.D. Iowa 2002) (declining to impute wife's fraudulent intent to husband, who received a salary from wife's business and was involved in management decisions, when husband had not knowingly permitted wife or held her out as possessing authority to enter into business loan with bank and pledge collateral owned solely by husband); First Sec. Bank v. Steinman (In re Steinman) , 61 B.R. 368, 374 (Bankr. W.D. Mo. 1986) (declining to impute husband's fraudulent intent to wife where, although wife knew husband would be making representations to bank regarding their farming operations, she did not assent to the specific misrepresentations or give husband general authority to act for her in signing fraudulent financial statement).
In the case of Connecticut Attorneys Title Ins. Co. v. Budnick (In re Budnick) , 469 B.R. 158 (Bankr. D. Conn. 2012), prior to their divorce, a wife served as accountant for three business entities in which her husband had an ownership interest. Id. at 164-65. The wife was simultaneously employed as an accountant by the plaintiff. Id. at 164. Among the husband's business entities was a limited liability company through which he and his wife decided to build and operate a public skating rink (the "LLC"). Id. The husband and wife considered the skating rink to be a "joint project." Id. at 165. They applied for a small business loan together and contributed all of their household funds on hand to fund the project. Id.
As accountant and bookkeeper for the LLC, the wife's responsibilities included handling all of the funds that came in and out of the LLC. Id. at 166. She also had authority to sign and endorse checks and to deposit funds on behalf of the LLC. Id. The husband generally did not see the LLC's bank statements. Id. The husband and wife did not take a salary from the LLC, but the wife used the LLC's profits to pay for household expenses. Id.
When the project encountered construction problems that resulted in an increase in costs and a delay in opening the skating rink, the wife informed the husband that the LLC was unable to pay its expenses. Id. As a result, the husband asked the wife to obtain a loan from her father. Id. Instead, the wife embezzled funds from her other employer (i.e., the plaintiff) and told her husband that the funds were a loan from her father. Id. at 167. The court found that the wife generally acted as the husband's agent with respect to the LLC. Id. at 172. However, the court concluded that the wife's embezzlement was outside the scope of their agency relationship and declined to impute the wife's fraud to the husband under 11 U.S.C. § 523(a)(2)(A) :
[The wife] kept the ... Embezzlements a secret from the [husband]. Furthermore, the [husband] told [the wife] to obtain a loan from her father; embezzling from the Plaintiff was [the wife's] own idea. The court finds that [the wife] could not reasonably have understood that the ... Embezzlement[s] were within the scope of her actual authority. Accordingly, the court is not persuaded that the ... Embezzlements were within the scope of [the wife's] agency for the [husband].
Id. at 175.
II. Justifiable Reliance
The reliance that a creditor must show under 11 U.S.C. § 523(a)(2)(A)
*851 is justifiable reliance, which is a more lenient standard than reasonable reliance. See Field , 516 U.S. at 74-5, 116 S.Ct. 437. More specifically, the appropriate standard is not "reasonableness" in the sense of whether an objectively reasonable person would have relied upon the defendant's false representations. Johnson v. Riebesell (In re Riebesell) , 586 F.3d 782, 791 (10th Cir. 2009). "Rather, the inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." Id. (citing Field , 516 U.S. at 74-5, 116 S.Ct. 437 ). Thus, in determining whether a creditor's reliance was justifiable, courts should examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [apply] a community standard of conduct to all cases." Field , 516 U.S. at 71, 116 S.Ct. 437 (citation omitted).
In the investment context, courts find that numerous qualities and characteristics of the particular plaintiff bear on whether his reliance was justifiable, including, inter alia , the plaintiff's sophistication, experience in financial and investment matters, age, education, professional status, and business background. See e.g. Myers v. Finkle , 950 F.2d 165, 167 (4th Cir. 1991) (examining justifiable reliance in the context of an action under § 10(b) of the Securities Exchange Act of 1934); see also Phoenix Equity Ventures, LLC v. Baillio (In re Baillio) , No. 7-08-12171 JA, 2010 WL 3782065, at *16 (Bankr. D.N.M. Sept. 21, 2010) (finding that plaintiff's reliance was not justifiable under 11 U.S.C. § 523(a)(2)(A) where plaintiff's members were "intelligent, well educated, and very experienced in real estate matters," and should be held to that "level of capacity, knowledge and sophistication"). Courts also look to the extent of the personal and business relationship between the plaintiff and the defendant to determine whether the plaintiff's reliance was justifiable. See e.g. , Heide v. Juve (In re Juve) , 761 F.3d 847, 853 (8th Cir. 2014) (finding that plaintiff's reliance was justifiable under 11 U.S.C. § 523(a)(2)(A) where defendant took advantage of his friendship with plaintiff and misused the trust associated with their employer-employee relationship by inducing plaintiff to make loans to defendant's business and misappropriating the funds).
The justifiable reliance standard does not impose a duty on the plaintiff to investigate a representation of fact, "although he might have ascertained the falsity of the representation had he made an investigation." Field , 516 U.S. at 70, 116 S.Ct. 437 (citation omitted). However, justifiable reliance is not without its limits. Id. at 71, 116 S.Ct. 437. The plaintiff is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Id. (citation omitted). "In other words, if there are any warning signs ... in the documents, in the nature of the transaction, or in the [defendant's] conduct or statements, the [plaintiff] has not justifiably relied on his representation." Guske v. Guske (In re Guske) , 243 B.R. 359, 363-64 (8th Cir. BAP 2000) (citation omitted).
Courts have identified several "warning signs" or "red flags" that may render reliance unjustified. When a plaintiff is in possession of documentation which indicates he is being deceived, it is a red flag that requires the plaintiff to further investigate. See e.g. , Posen v. Scialdone (In re Scialdone) , 533 B.R. 53, 62 (Bankr. S.D.N.Y. 2015) (finding that plaintiffs' reliance was not justified under 11 U.S.C. § 523(a)(2)(A) where defendant provided them with draft of tax return plaintiffs knew was inaccurate prior to making investment *852 ); Provident Bank v. Merrick (In re Merrick) , 347 B.R. 182, 188 (Bankr. M.D. La. 2006) (finding that plaintiff's reliance was not justified under 11 U.S.C. § 523(a)(2)(A) where plaintiff permitted defendant to mortgage property even though defendant had given plaintiff a copy of her late-husband's will which indicated she only had a partial interest in the property). It is also a red flag when a defendant purports to be successful businessperson but is seeking high-interest financing in the alternative financing market. See e.g. , Baillio , 2010 WL 3782065, at *16-17 (finding that plaintiff's reliance was not justifiable under 11 U.S.C. § 523(a)(2)(A) where, inter alia , defendant claimed to be an experienced real estate investor with a net worth of over $ 7.9 million but sought a loan in the alternative financing market with a 360% interest rate). A promised return on investment that is too good to be true is another red flag. See e.g. , Johnson v. Curtis (In re Curtis) , No. 02-74988, 2006 WL 1506209, at *10 (Bankr. C.D. Ill. May 24, 2006) (finding that plaintiffs' reliance was not justified under 11 U.S.C. § 523(a)(2)(A) where defendant promised return of 100% within 15 days of the loan). Yet another red flag is when the party who negotiated the terms of a loan by the plaintiff is someone other than the defendant. See Minnesota Client Security Board v. Wyant (In re Wyant) , 236 B.R. 684 (Bankr. D. Minn. 1999).
In Wyant , the defendant was one of two shareholder attorneys in a law firm. Id. at 688. The plaintiff was the Minnesota Client Security Board, which had paid on claims filed by clients of the law firm for losses from loans they made to either the law firm or to a corporation partially owned by the shareholder attorneys. Id. The non-defendant shareholder had preexisting relationships with many of the clients. Id. at 689-92. The non-defendant shareholder solicited each of the loans and met with every client regarding each loan. Id. Some clients dealt exclusively with the non-defendant shareholder regarding the loans, while the defendant was minimally involved with other clients. Id. Whenever the defendant appeared at a client meeting regarding a loan, he did so briefly and generally just to execute a personal guaranty on the loan. Id.
The plaintiff commenced an adversary proceeding against the defendant, seeking to have the sum of the claims paid to the clients determined non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Id. at 691. The court emphasized that "[t]he nature and extent of [the defendant's] involvement in the loan transactions, and the significance of his relationship with the clients" were "at the heart" of the proceeding. Id. at 691-92. The court found that, due to the non-defendant shareholder's "overwhelmingly dominant and conclusive role in procuring the loans," the clients' reliance was not justifiable as to the defendant:
If this case were about misrepresentations made by [the non-defendant shareholder], it would require considerable attention to the details of each client's relationship with [the non-defendant shareholder] and of each discussion leading to the loan transactions in order to determine whether reliance on his misrepresentations was justified.
However, this case is about misrepresentations purportedly made to the clients by [the defendant] through an impression he gave from his silence and inactivity. But even if he did, they were de minimis. The real sell was coming from [the non-defendant shareholder]. He solicited every loan. He held meetings with every client regarding each loan. Each client received legal services *853 from [the non-defendant shareholder] either exclusively or primarily.
The testimony of the clients on the subject of [the defendant's] presence at meetings to discuss the loans and on the nature of his participation was inconsistent and not particularly credible. If [the defendant] attended any of these meetings, he entered merely to sign a guaranty and was only briefly present. If [the defendant] made any representations at these unlikely appearances, they were limited.
Most important, the testimony of the clients made it patent that [the defendant's] participation, whatever it was, did not constitute a determinative factor in their decisions to enter into the loan transactions....
All of the clients entered into the transaction because of whatever [the non-defendant shareholder] was telling them and based on their trust in him. None of [the] clients relied on representations made by [the defendant], and if they did, it was at most only in small part, and clearly not fatefully. In any event, under the circumstances of [the non-defendant shareholder's] overwhelmingly dominant and conclusive role in procuring the loans from the clients, relying on [the defendant's] minor participation would not be justified.
Id. at 699-700.
The Court will now address the April 13 Note and the April 27 Note in reverse order.
III. The April 27, 2007 Note
The Bollings clearly had a business relationship. They "flipped" approximately fifteen properties together, wherein Ms. Bolling designed and drafted construction drawings for the homes that Mr. Bolling built. Ms. Bolling also purchased properties, took out loans, signed promissory notes, and executed trust indentures for her and Mr. Bolling's "flips." Moreover, Ms. Bolling was the vice president of Investment Land Group, LLC, the entity through which the Bollings' "flips" were funded. Ms. Bolling also believed that she and Mr. Bolling had 50/50 ownership interests in Global Investment Enterprises, LLC, which was the sole member of Investment Land Group, LLC and an entity through which the Bollings developed land. In fact, Ms. Bolling was the sole owner of Global Investment Enterprises, LLC (albeit, unbeknownst to her at the time).
The Court finds that the degree of the Bollings' business relationship establishes that Mr. Bolling generally acted as Ms. Bolling's agent with respect to their "flips." However, the scope of said agency relationship was not unlimited. For example, Ms. Bolling did not give Mr. Bolling permission to pledge land solely owned by her as collateral to secure loans to fund their "flips." Ms. Bolling testified that she was the sole owner of Lot 2 of Karrow Ashley Estates at the time that the April 27 Note was executed. Ms. Bolling also testified that she did not give Mr. Bolling permission to pledge Lot 2 of Karrow Ashley Estates as collateral for the April 27 Note, and that he otherwise had no authority to do so because he had no ownership interest in Lot 2 of Karrow Ashley Estates.
Further, Ms. Bolling did not give Mr. Bolling authority to sign her name on documents in connection with their "flips." Ms. Bolling testified that she did not endorse the March 30 Check made out by Mr. Postovit in connection with the April 27 Note. Ms. Bolling's testimony on this matter has remained consistent since she was deposed for the State Court Proceeding in 2008. The Court notes that the endorsement on the March 30 Check differs markedly in both substance and form *854 when compared to every other piece of documentary evidence before the Court which bears Ms. Bolling's signature. The March 30 Check is endorsed by "H Bolling," whereas every other signature purporting to belong to Ms. Bolling reflects her full first name. Additionally, the handwriting of the endorsement on the March 30 Check does not appear to match the handwriting of any other signature purporting to belong to Ms. Bolling.
Ms. Bolling also disputed that she executed the Stratus A Trust Indenture and testified that she believed her signature was forged. Ms. Bolling testified that she neither borrowed the $ 456,000 nor had knowledge of the August 20, 2007 promissory note contemplated by the Stratus A Trust Indenture. The Court can discern no legitimate reason why-all in one day-Ms. Bolling would execute a trust indenture for Lot 2 of Karrow Ashley Estates in favor of an entity owned by Mr. Bolling in order to secure a loan, and then immediately transfer Lot 2 of Karrow Ashley Estates back to herself through a deed of reconveyance (wherein her name was misspelled). The Court notes that this series of transactions is highly suspect and, taken together with Ms. Bolling's corroborated testimony that she was a victim of identity theft by Mr. Bolling, further indicates that Mr. Bolling defrauded Ms. Bolling.
Because Mr. Bolling apparently defrauded Ms. Bolling in the process of executing the April 27 Note, the Court finds that any fraud committed by Mr. Bolling in connection with the April 27 Note fell outside the scope of the agency relationship between the Bollings. Thus, while Mr. Bolling may have made false representations in the April 27 Note and during the negotiation thereof with an intent to deceive Mr. Postovit, that intent cannot be imputed to Ms. Bolling.
Outside of the agency relationship between the Bollings, the scope of which the Court has found was exceeded, the Court can find no credible evidence that links Ms. Bolling to the April 27 Note or the March 30 Check. The April 27 Note was signed by Mr. Bolling, not Ms. Bolling. Ms. Bolling disputed Mr. Postovit's uncorroborated testimony that she delivered the April 27 Note to him in the lobby of Merrill Lynch, testifying that she had never been there "in [her] life." Ms. Bolling also disputed that she retrieved the March 30 Check from Mr. Postovit at that time, testifying that she "never touched" the March 30 Check. Consistent with Ms. Bolling's testimony, the March 30 Check does not appear to have been endorsed by Ms. Bolling, and she further testified that she did deposit the March 30 Check.
Accordingly, because the Court finds that Ms. Bolling possessed no fraudulent intent, imputed or otherwise, the Court need not reach the issue of whether Mr. Postovit's reliance on the false representations in the April 27 Note and related negotiations was justifiable.
IV. The April 13, 2007 Note
a. Ms. Bolling's Intent
Unlike the April 27 Note, Ms. Bolling's involvement with the April 13 Note is well-supported by the facts. The April 13 Note bears Ms. Bolling's signature. Both Mr. Postovit and Mrs. Postovit independently testified that the April 13 Note was executed at Wells Fargo bank, and that Ms. Bolling was present. Mr. Postovit further testified that he witnessed Ms. Bolling sign the April 13 Note. Ms. Bolling testified that she did not recall meeting Mr. Postovit at Wells Fargo Bank or signing the April 13 Note, but she conceded that where a document is notarized, a notary generally must confirm the signatory's identity and witness the signing of *855 the document. The Court finds that Mr. Postovit and Mrs. Postovit's testimony was more credible than Ms. Bolling's on this matter.
The April 13 Check made out by Mr. Postovit in connection with the April 13 Note also bears Ms. Bolling's endorsement. Unlike the March 30 Check, Ms. Bolling did not dispute that she endorsed the April 13 Check. Rather, Ms. Bolling testified that the endorsement looked familiar and she "could have endorsed" the April 13 Check, but that she was not "sure" she had endorsed the April 13 Check. Ms. Bolling also conceded that she "pick[ed] up" the April 13 Check from Mr. Postovit and put it under Mr. Bolling's office door.
It may be true that, consistent with Ms. Bolling's testimony, Ms. Bolling did not receive any benefit from the April 13 Check.[6] It may also be true that when Ms. Bolling executed the April 13 Note, she believed she was executing a land sale contract for Lot 4 of Emerald Point. Taking both as true for the sake of argument, the Court would be hard-pressed to find that Ms. Bolling possessed actual fraudulent intent.
However, the Court has already noted that taking out loans and signing promissory notes for their "flips" was generally within the scope of the Bollings' agency relationship. Due to Ms. Bolling's level of direct involvement with the April 13 Note and the April 13 Check, the Court is not persuaded that the fraud committed by Mr. Bolling in connection therewith fell outside scope of said agency relationship. Even a cursory examination by Ms. Bolling would have revealed the true nature of Mr. Bolling's dealings with Mr. Postovit. As a result, the Court finds that Mr. Bolling's intent to deceive Mr. Postovit through the false representations in the April 13 Note and related negotiations may be imputed to Ms. Bolling.
The only issue that remains is whether Mr. Postovit's reliance on the false representations was justifiable.
b. Mr. Postovit's Reliance
One factor that weighs against justifiable reliance is that Mr. Postovit was not an unsophisticated investor. His business background included owning and operating a small business and working in the financial services industry. At the time the April 13 Note was executed, Mr. Postovit was a licensed investment advisor at Merrill Lynch and had worked in that capacity for approximately three years. During that time, Mr. Postovit also received training to be an investment advisor at Edward Jones and held investments of his own through the same, including stocks, bonds, and mutual funds. While Mr. Postovit had no formal real estate investment experience, he did have experience with real estate-backed security agreements on a personal level, as he had purchased two homes subject to secured mortgages. Mr. Postovit also took out a second mortgage on his home in Emerald Point in order to fund the loan memorialized by April 13 Note. Mr. Postovit presumably executed separate notes and deeds of trust in connection with both home purchases and the second mortgage and, therefore, knew that a promissory note alone was not sufficient to grant a security interest in real property.
On the other hand, a factor that may weigh in favor of justifiable reliance is that Mr. Postovit had a preexisting relationship with the Bollings which could have fostered a sense of trust between the parties.
*856 At the time the April 13 Note was executed, Mr. Postovit had known the Bollings for approximately three years. They socialized together at dinners and parties at one another's homes and the homes of mutual friends. Their daughters also carpooled to school together, played together, and had periodic sleepovers. There was a factual dispute at trial regarding the closeness of the relationship between the Postovits and Bollings. Namely, whether there were always other people present when the Postovits and Bollings socialized. In any event, by Mr. Postovit's own testimony, Mr. Postovit apparently spent more time with Mr. Bolling than Ms. Bolling: "I invited Marc to go hunting in North Dakota where I'm from. He flew me over in his plane ..." (Trial Tr. 22:6-8). Mr. Postovit did not testify that he ever spent any significant time alone with Ms. Bolling.
In fact, it was Mr. Bolling alone who negotiated the terms of the April 13 Note with Mr. Postovit. Ms. Bolling was not party to the negotiations. It was also Mr. Bolling alone who walked with Mr. Postovit to see the lots that Mr. Bolling falsely represented he and Ms. Bolling intended to "flip." Ms. Bolling was not present. In this respect, Mr. Postovit ignored a red flag in the nature of the transaction involving the April 13 Note and the April 13 Check. Despite Mr. Bolling's exclusive involvement in procuring the loan memorialized by the April 13 Note, it was Ms. Bolling, not Mr. Bolling, who met with Mr. Postovit to execute the April 13 Note.
Mr. Postovit also ignored a red flag in the April 13 Note itself. The April 13 Note plainly contemplated a trust indenture on Lot 4 of Karrow Ashley Estates. Yet, no trust indenture was presented to Mr. Postovit when he executed the April 13 Note and the April 13 Check, or at any time thereafter. Mr. Postovit testified that he never requested documentation or other proof of the executed trust indenture for Lot 4 of Karrow Ashley Estates because "[the Bollings] were the experts in the real estate business," and he "gave them the money and trusted them that they would do what they said they were going to do." This is true even though Mr. Postovit almost certainly knew that the April 13 Note alone was not sufficient to grant him a security interest in Lot 4 of Karrow Ashley Estates.
The Court finds that the red flags in the April 13 Note and the nature of the transaction should have put Mr. Postovit on notice that further investigation was required before he tendered $ 150,000 to invest in one of the Bollings' "flips." Instead, Mr. Postovit, apparently all too eager to receive a 25% return on a relatively short-term investment, ignored the red flags in executing the April 13 Note and the April 13 Check. Indeed, Mr. Postovit continued to ignore the red flags when he tendered an additional $ 100,000 to invest in "flipping" a second lot a mere two weeks later. Notwithstanding Mr. Postovit's testimony that whether he would invest to "flip" a second lot would depend on the outcome of the first "flip," Mr. Postovit made the second investment even though he had not yet received a return on the April 13 Note.
Under the facts and circumstances of this case, the Court finds that Mr. Postovit's reliance as to Ms. Bolling was not justified. If this case were about Mr. Postovit's reliance on Mr. Bolling, perhaps the outcome would be different. However, Mr. Bolling is not a party to this proceeding. Here, the record simply does not suggest that Ms. Bolling's relatively minor participation was a determinative factor in Mr. Postovit's decision to enter into the transaction memorialized by the April 13 Note.
*857 CONCLUSION
Mr. Postovit and Ms. Bolling's vastly different versions of events rendered this a considerably factually complex case. This was not helped by the shifting credibility of the parties throughout trial. In many respects, the Court was left with more questions than with answers after trial.
For example, why did Mr. Postovit invest in "flipping" a second lot a mere two weeks after he executed the April 13 Note, when he testified that whether he would invest to "flip" a second lot would depend on the outcome of the first "flip"?
Mr. Postovit testified that he took a second mortgage out on his home to fund the loans memorialized by the April 13 Note and the April 27 Note. How did he know to take out an amount sufficient to fund both loans when the April 13 Note was supposedly executed without contemplation of an imminent second investment?
Why did the March 30 Check, executed in connection with the April 27 Note, predate the April 13 Note and the April 13 Check?
What is clear to the Court, however, is that Mr. Postovit failed to meet his burden under 11 U.S.C. § 523(a)(2)(A) as to Ms. Bolling.
It appears to the Court that both Mr. Postovit and Ms. Bolling were victims of a fraudulent scheme perpetrated by Mr. Bolling. Mr. Bolling made false representations in the April 13 Note, the April 27 Note, and during the negotiations thereof. However, in the process of defrauding Mr. Postovit, Mr. Bolling also defrauded Ms. Bolling. Mr. Bolling's fraud on Ms. Bolling is amply corroborated by the evidence before the Court. While the Court acknowledges the unfortunate result of this ruling for Mr. Postovit, the Court notes that Ms. Bolling is not the proper party to make him whole.
Accordingly, it is
ORDERED that judgment shall enter in favor of Ms. Bolling and against Mr. Postovit on his claim under 11 U.S.C. § 523(a)(2)(A). This claim shall be dismissed with prejudice.
IT IS FURTHER ORDERED that because Mr. Postovit declined to prosecute his claim under 11 U.S.C. § 523(a)(2)(B), judgment shall enter in favor of Ms. Bolling and against Mr. Postovit. This claim shall be dismissed with prejudice.
IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment accordingly.

At trial, there was a factual dispute as to whether Ms. Bolling also kept the books for her and Mr. Bolling's "flips." Mr. Postovit's wife, Tara Postovit, testified that it was her understanding that Ms. Bolling kept the books (Trial Tr. 64:12-21; 73:3-9). Ms. Bolling testified that she has maintained since a prior deposition in 2008 that another individual kept the books, and that said individual reported to Mr. Bolling (Trial Tr. 86:15-87:12; 152:4-21). The Court finds that Ms. Bolling's testimony was more credible on this matter. Therefore, the Court finds that this fact has little bearing on the instant proceeding.

At trial, Mr. Postovit also gave testimony which indicated that he believed the Bollings were successful "flippers" because they drove "nice executive cars" (Trial Tr. 24:13-16) and took a sailing vacation with mutual friends on a chartered boat (Trial Tr. 24:17-25). The Court notes that, at all times relevant to this proceeding, the Bollings had full-time careers outside of "flipping" real estate. There is no evidence or testimony before the Court to suggest that the Bollings attributed their cars or vacations to their success as "flippers."

Mr. Postovit testified at trial that Ms. Bolling "told [him]" that she drafted the promissory notes (Trial Tr. 53:11-19). Ms. Bolling testified that Mr. Bolling's attorney drafted the documents pertaining to her and/or Mr. Bolling's "flips" (Trial Tr. 83:9-10; 152:4-5). Ms. Bolling further testified that she has no legal training and drafting promissory notes is not within her skillset (Trial Tr. 117:22-118:1). The Court finds that, particularly in light of the complexity of the promissory notes, Ms. Bolling's testimony was more credible on this matter.

Mr. Postovit does not assert that the State Court Judgment has preclusive effect in the instant proceeding. The Court notes that the doctrine of collateral estoppel is not implicated because the State Court Judgment makes no finding of fraud.

Because intent to deceive is an element of proof under both subparagraphs of 11 U.S.C. § 523(a)(2), the Court is not constrained to analyzing legal precedent decided only under 11 U.S.C. § 523(a)(2)(A). See Agribank, FCB v. Gordon , No. 5:01-CV-374-4DF, 2002 WL 32155708, at *3 (M.D. Ga. Sept. 18, 2002) (collecting cases and applying analysis for determining intent under 11 U.S.C. § 523(a)(2)(A) to a claim under 11 U.S.C. § 523(a)(2)(B) ).

No bank records were offered into evidence to permit the Court to conclusively trace the funds.